In re WILLIAMS' ESTATE.

ANHEUSER–BUSCH BREWING ASS'N v. HARRISON (two cases).

(Circuit Court of Appeals, Ninth Circuit. November 4, 1907.)

No. 1,339.

1. BANKRUPTCY—APPELLATE JURISDICTION—MODE OF REVIEW.

Where an appeal taken in a bankruptcy proceeding under Bankr. Act July 1, 1898, c. 541, § 25a, 30 Stat. 553 [U. S. Comp. St. 1901, p. 3432], involves only a question of law, it may be treated by the appellate court as a petition to revise.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 929.]

2. SAME—LIENS—ENFORCEMENT IN BANKRUPTCY COURT—COSTS CHARGEABLE TO PROCEEDS.

The proceeds of property of a bankrupt, covered by valid liens and sold by the court of bankruptcy by request or consent of the lien holders, who subsequently filed their claims in such court, which were allowed as secured claims in an amount in excess of such proceeds, are properly chargeable with the costs of such court appropriate to the enforcement of the liens, but not with general costs of the administration of the estate, such as the general fees of the trustee and his attorney, or for the services of a receiver in carrying on the business of the bankrupt and his attorney, or for the expenses and losses of such business.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

Petition for Revision of Proceedings of the District Court of the United States for the Northern Division of the Western District of Washington, in Bankruptcy.

Willett & Willett, W. H. Chickering, Warren Gregory, and Allen L. Chickering, for petitioner and appellant.

John H. Allen, for respondent and appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The question involved in these proceedings is one of law and arises upon the record. The appellant and petitioner, being uncertain in respect to the proper procedure, sought and was by the court below allowed an appeal from the ruling of that court complained of, and also filed therein a petition for the revision

of the same order. The two proceedings were by this court consolidated, and were heard and submitted on one record. If it be conceded that the petition for revision was filed in the wrong court, the appeal, involving as it does only a question of law, may be treated as a petition for revision. In re Abraham, 93 Fed. 767, 783, 784, 35 C. C. A. 592; In re Blair, 106 Fed. 662, 665, 45 C. C. A. 530; In re Jacobs, 99 Fed. 539, 39 C. C. A. 647.

In brief, these, among other, facts, are made to appear by the original and supplemental records filed herein: On the 16th day of September, 1905, Williams, who was at the time conducting a saloon and café in the city of Seattle, was adjudged a bankrupt. The matter was duly referred to one of the referees in bankruptcy, and one Murray was appointed receiver of the bankrupt's estate. The receiver qualified as such and proceeded to carry on the business in much the same way that the bankrupt did—at a loss. On the 11th of October, 1905, the Anheuser-Busch Brewing Association and Pacific & Puget Sound Bottling Works, corporations, presented to the referee a petition setting forth various loans made by the association to Williams, secured by certain chattel mortgages executed by him upon the contents of his saloon and café, and by the assignment of the leases of the premises and insurance policies thereon, and also by the bottling company, under certain agreements with Williams, all of which were specifically set forth in the petition, together with the alleged failure of the trustee in bankruptcy to pay certain installments of the rent due, and the alleged payment by the brewing association of the premium upon the insurance and its payment of the rent in order to protect the premises, and setting forth the maturity of the respective loans so secured by the mortgages, assignments, and other agreements set forth in the petition, and alleging that all of the assets of the bankrupt's estate, except such as were held by other preferred creditors, were contained in the saloon and café in the city of Seattle known as "The Pike," which place had been running and doing a good business up to the time of Williams' adjudication in bankruptcy; that it had acquired a valuable good will, which was becoming less every day the place remained closed; that it was impracticable to conduct the place under the trustee in bankruptcy, for the reason that the stock that would have to be sold by him was covered by the chattel mortgages, and that the place could not be made to pay under a trustee in any event; that a purchaser could be had at the time, if the place could be sold immediately, who would pay what the place was reasonably worth, and more than it would bring if such sale were postponed; that arrangements could probably be made between the petitioners and any purchaser who might take the place at the time that would make it possible for the purchaser to pay something for the equity of the estate over and above all claims of the petitioners; that the general creditors had little or no interest in the estate, and could get nothing on their amounts if a sale should be postponed; that the property was depreciating in value, and would continue to depreciate so long as it remained unsold; that the assets were uninsured, and there was imminent danger of total loss; that it would be necessary, if the sale should be postponed, to have the property insured and extra expense

incurred therefor; that the trustee had no funds with which to pay the rent of said premises, and the owners thereof were threatening to declare a forfeiture of the leases; that an emergency existed such as would justify the court in ordering an immediate sale of "The Pike," together with the stock therein and its license, without the usual notice to creditors; that the petitioners were entitled to have their securities foreclosed and the proceeds applied to the payment of their preferred claims, as set forth in the petition, and insisted on the same being done. The petitioners therefore prayed an order of the District Court directing the trustee to sell all of the assets of the estate covered by the alleged securities at public or private sale, as the court might deem best; that such sale be made absolute and free from any and all liens or incumbrances; that the court declare that an emergency existed and order the trustee to make such sale forthwith; that the proceeds thereof be paid into court to be applied to the preferred liens of the petitioners as set forth in the petition; that they be declared joint creditors as to one-half of the $3,000 loan set forth in the petition, which was not secured to either of them; that the trustee be required to keep the place known as "The Pike" and all assets therein covered by insurance, and in a sum equal to its value, pending the sale, and that the rights of the petitioners therein be properly protected; that a proper order be made concerning the payment of the rent of the premises; that no property covered by the mortgages set out in the petition be removed by the trustee from "The Pike" pending the sale, and that attorney's fees, as provided for in the notes and mortgages set out by the petitioners, be allowed.

On the 17th day of October, 1905, the trustee of the bankrupt estate also petitioned the court for a sale of all of the property of the bankrupt at private sale, subject to the amount due upon the debt secured by the $5,000 mortgage held by the brewing association and free and clear of any lien or claim of the $4,000 mortgage held by that association. The petition of the trustee stated that he had filed in court an inventory of all of the property of the bankrupt, except the two leases held by him of a portion of the Eitel Building, and that those leasehold interests and the personal property mentioned in the inventory constituted all of the property of the bankrupt, or in which he had any interest, that had come to the knowledge of the trustee. The petition of the trustee also contained the following:

"That the bankrupt was in the saloon business; that he had a place on First avenue, which he had disposed of just prior to the filing of the petition in bankruptcy herein; that his other place was on Pike street, in the Eitel Building, and was known as 'The Pike'; that upon disposing of the First Avenue place the bankrupt retained therefrom a large amount of stock and property, and the same has at all times been kept separate and apart from the property at 'The Pike'; that some of the creditors hold claims solely for goods sold at First avenue and others hold claims solely for goods sold at 'The Pike.' Therefore your trustee thought it for the best interests of all parties concerned to keep said property separate, and has inventoried the same separately as appears from said inventory. That upon the property at 'The Pike' and upon the leasehold interests there appears to be two mortgages, both held by the Anheuser-Busch Brewing Association, one being to secure a supposed claim of five thousand dollars ($5,000.00), and the other for a supposed claim of four thousand dollars ($4,000.00); that so far as your trustee has been

able to ascertain thus far the $5,000 mortgage is a valid and subsisting lien for such amount as may be due upon the debt secured thereby, but your trustee is informed and believes that there is some question as to the validity of the lien of the $4,000 mortgage, and creditors holding claims aggregating large amounts have requested your trustee to contest the lien and validity of the $4,000 mortgage."

The petitions for the sale came on for hearing before the District Court on the 17th day of October, 1905, and resulted in the making of an order for such sale in accordance with the agreement of the respective parties, which agreement is recited in the order of the court as follows:

"It was agreed by all parties concerned that the interests of the bankrupt's estate and of all of his creditors would be best subserved and protected if an immediate sale of all the property of the said bankrupt now in possession and under the control of the trustee be had, and it appearing that the costs and expenses of keeping said property are great and are accumulating rapidly, and that unless an immediate sale of all of the property be had the property will be greatly reduced by reason of such expense and there being no objection made to an immediate sale thereof, all parties consenting thereto; and it further appearing to the court that it will be for the best interests of the bankrupt, of his estate, and of all of his creditors, and of all parties concerned if said sale be made at private sale on sealed bids, and if (that) the said property and all thereof be sold free and clear of any supposed claim of mortgage or mortgages held by the Anheuser-Busch Brewing Association or by the Puget Sound Bottling Works, or by both or either of them, and the said Anheuser-Busch Brewing Association and the said Puget Sound Bottling Works and all parties present consenting that such be done, and further consenting that in making said sale the property inventoried as being the property at the First Avenue place be sold separate and apart, and the proceeds derived therefrom be kept separate and apart from that obtained from the sale of the leasehold interests and the property inventoried as being 'The Pike' stock."

The order of sale concluded with this paragraph:

"It is hereby further ordered that the proceeds of said sale shall be held by the court subject to the same preferences, liens, and mortgages as now exist against the property aforesaid."

On the 30th day of October, 1905, the property was sold, according to the certificate of the referee, "for about $10,000." The certificate of the referee further states that the—

"amount of alleged claims of said Anheuser-Busch Brewing Association filed herein, ten thousand four hundred and twenty-five dollars ($10,425); amount of secured claims of the said Anheuser-Busch Brewing Association, which now stand as allowed and uncontested, eleven hundred and twenty-five dollars ($1,-125): that as to the remainder of said alleged claims a contest is pending which has not been heard: that it is claimed on the part of said Anheuser-Busch Brewing Association that their lien attached to all of the property which has been sold, as above stated; that a meeting of creditors was regularly called for the purpose of passing upon the accounts of the receiver and trustee and the adjustment of expenses of administration, and continued from time to time until the date of the order sought to be reviewed, on which date and at the meeting so adjourned the said order was made and the items allowed as shown by the minutes of the meeting or order sought to be reviewed and authorized to be paid out of the funds in the hands of the trustee derived from the sale above set forth."

At one of those meetings, held January 9, 1906, the following proceedings were had:

"The report and account of receiver was approved and allowed, and the unpaid expenses of administration incurred by the receiver directed to be paid as follows:

Seattle-Tacoma Power Co., light and steam heat................$ 30 04
Haswell & Co., one ton coal.......................................  6 25
Pacific & P. S. Bottling Co., soda water and beer................ 44 25
T. H. Wagner, band.............................................. 133 58
J. N. Damon, services..........................................  10 00
J. Garrick, services............................................  3 00
                                                              ————
                                                              $227 12

"Upon consideration of the matter of fees of the receiver and his attorneys, the trustee was ordered, directed, and empowered to pay same as follows:

Wm. H. Murray, services as receiver...........................$ 70 00
McClure & McClure, attorneys for receiver...................... 100 00
                                                              ————
                                                              $170 00

"The Pacific & Puget Sound Bottling Company and the Anheuser-Busch Brewing Association, by their said attorneys, excepted to same allowances, and all and every part thereof, and the exception was allowed by the court."

At another of the meetings, held March 2, 1906, the following proceedings were had:

"At a meeting of the creditors regularly called for the purpose of making allowances in said estate on account of fees of the attorneys and the trustee and paying the expenses of the said trusteeship, regularly adjourned to this date, it is now here ordered that the said trustee, A. H. Harrison, pay as follows, to wit:

The garbage man...............................................$ 2 00
Appraisers for the liquors...................................... 10 00
Appraisers for the other goods................................. 10 00
Times Printing Co., printing notice of sale.....................  6 00
Post-Intelligencer, printing notice of sale.....................  3 30
The Star, printing notice of sale...............................  3 00
Watchman for said goods........................................ 60 00

"That he pay his attorneys, Allen, Allen & Stratton, the sum of three hundred ($300.00) dollars as temporary allowance on account of their fees herein, and himself as a trustee herein the sum of two hundred and one ($201.00) dollars. To all of which said orders, and to each thereof, the Anheuser-Busch Brewing Association, by its attorneys, Willett & Willett, excepts. Exception noted."

By the supplemental record filed herein on the 21st day of October, 1907, it appears that the receiver subsequently allowed all of the secured claims as made by the brewing association and that his action in that regard was by the court below approved on the 23d day of August, 1907, those secured claims being specified in the order of the court below as follows:

"One claim for $4,100 and interest, one claim for $4,000 and interest, one claim for $1,500 and interest, and one claim for $825 and interest, be and the same hereby are allowed as secured claims, as alleged in the proofs of said claims on file. One unsecured claim of said claimant for $3,000, having been heretofore allowed by the receiver and not included in the petition for review, is not affected by this order."

It thus appears that all of the property of the bankrupt was covered by the brewing association's liens, and that the total amount realized from the sale of the property upon which the petitioner had valid liens was less than the amount of those liens. The real question for

decision, therefore, is to what extent, if at all, funds realized by the sale of property upon which a creditor of a bankrupt has valid liens, proof of which secured claims is filed in the bankruptcy court after the making of such sale, and when the proceeds of the sale are insufficient to pay the liens in full, may be used to pay the general costs of administration of the bankrupt's estate.

It is true that the record in the case shows that the lienholder voluntarily came into the bankruptcy court and asked that the property covered by its liens be sold by that court. The bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]), in terms declares that none of its provisions shall affect a valid lien. But the estate of a bankrupt is interested in any excess that may exist over and above the amount of such liens. So it was held by this court in the case entitled In re Jersey Island Packing Co., 138 Fed. 625, 627, 71 C. C. A. 75, 2 L. R. A. (N. S.) 560, that "property on which there is a mortgage or other lien passes to the trustee in bankruptcy, and is therefore in the custody of the court of bankruptcy," and, further, in the same case, that "the provision of the bankruptcy act that such a lien shall not be affected by the bankruptcy proceedings has reference only to the validity of the lienholder's contract. It does not have reference to his remedy to enforce his rights. The remedy may be altered without impairing the obligation of his contract, so long as an equally efficient and adequate remedy is substituted."

By coming into the bankruptcy court, therefore, the holder of a valid lien upon the estate of a bankrupt comes into an appropriate place and into a court amply able to enforce and protect his rights. By doing so the lienholder waives none of his rights. The enforcement of his lien in another court would entail upon the proceeds of the property upon which the lien exists the payment of the appropriate court costs; and so, in the enforcement of such lien in a court of bankruptcy, the proceeds of the property of the bankrupt upon which such lien exists is properly chargeable with the costs of such court appropriate to such enforcement, but with no other or further costs. They are not chargeable with the general costs of the administration of the bankrupt's estate, such as the services of a receiver in carrying on the business of the bankrupt, the expenses and losses of such business, the fees of the attorney for such receiver, the general fees of the trustee or those of his attorney. If so, the valid lien upon the estate of the bankrupt, which the bankruptcy act expressly declares shall be unaffected by any of its provisions, might very readily be destroyed, as it would unquestionably be, should such costs equal or exceed the proceeds in cases like the present, where the aggregate amount of the valid liens exceeds the proceeds of the entire estate of the bankrupt. In line with this ruling are the cases of Stewart v. Platt, 101 U. S. 731, 739, 25 L. Ed. 816; In re Utt, 105 Fed. 754, 45 C. C. A. 32; In re Prince & Walter (D. C.) 131 Fed. 546, 552; In re Bourlier Cornice & Roofing Co. (D. C.) 133 Fed. 958, 963; Loveland on Bankruptcy (3d Ed.) p. 775. See, also, Collier on Bankruptcy (6th Ed.) p. 497.

The cause is remanded to the court below, with directions to modify the order in accordance with the views above expressed.