WESTERN POWDER MFG. CO. v. INTER-
STATE COAL CO.

No. 204–D.

District Court, E. D. Illinois.

Jan. 4, 1936.

Bartley & Younge, of Peoria, Ill., for Pearl Rea Hutson, and others.

William M. Klein, of Chicago, Ill., for receivers.

Moses Pulverman, of Benton, Ill., for Horn Diamond Coal Co.

LINDLEY, District Judge.

On March 25, 1932, the court entered an order in this cause, enjoining present petitioners from forfeiting or attempting to forfeit the mining royalty contracts, hereinafter mentioned, until further order. This injunction has remained in full force and effect since that time.

On April 19, 1935, petitioners filed their formal petition to dissolve the injunctional order. To this petition the Horn Diamond Coal Company and the receivers have filed their separate answers.

In order to arrive at a fair and complete understanding of the situation, it is necessary to keep in mind certain facts. On July 15, 1907, petitioners and their predecessors entered into certain royalty contracts for the mining of coal, with Thomas Horn and Jesse Diamond for the land described in the petition, in Franklin county, Ill. The original contract purported to grant to the lessees the right to remove, in such manner as they saw fit, all coal underlying said land. The so-called lessors covenanted to pay all taxes on the land and the so-called lessees upon all buildings and improvements erected by them. In consideration of the grant of this right, the lessees agreed to pay to lessors the sum of three cents for every ton of merchantable coal taken from the land. No minimum royalty was provided, but it was agreed that until mining operations should be commenced, the lessees should pay $2 per acre for the land leased, one-half of which should thereafter be credited upon the earned royalties when operations should begin.

The contract provided that in case of default in any sum due for royalty for a period of thirty days, lessors should have a right to forfeit the contract and enter into exclusive possession of all the property and improvements thereon. The lessees agreed to proceed immediately to drill the lands, and had the option to buy the coal rights at $125 per acre. This contract was executed by the parties and was in full force and effect on July 20, 1912, when a supplemental contract was entered into, whereby additional acreage was included within the provisions of the contract, and in which there was inserted a provision that in case mining operations should be begun under and by virtue of the two contracts, thereafter, until after the time the tonnage of lands removed should have reached 1,000 tons per day, there should be paid a minimum royalty of $2,400 per annum until there remained less than 100 acres not mined, and that thereafter there should be a minimum royalty of $800 per annum. A still further supplemental contract of no material importance here was entered into on the 22d day of March, A. D. 1917.

It is apparent from the documents that the lessors were landowners and that their purpose and intent were to secure the use of the land through the lessees' efforts in a producing shaft coal mine. Lessees were to have the right to remove all the coal under the premises; and it is obvious that in order to proceed with the developments, shafts had to be sunk, tipples erected, hoisting and power plants erected, entries driven

and all the work done, funds expended, and capital invested necessary to bring about an operating mine producing over 1,000 tons of coal per day.

The first contract was complete in itself, and at the outset it is obvious that there is a grave question as to whether or not there was any consideration for the provision in the supplemental agreement for the payment of minimum royalties, for which no credit should be received on earned royalties. It would seem that the lessees then had a valid contract giving them the right to remove coal, upon payment of three cents a ton, and that there was in fact no consideration for the supplemental agreement, modifying this agreement, to pay, in addition thereto, a minimum royalty of $2,400 per year in case mining operations reached a capacity of 1,000 tons per day. Had the agreement provided that such royalties, when paid, should thereafter be credited upon the obligation for earned royalties accruing because of the actual mining of coal, consideration might have existed. The parties have not raised this point, and it is mentioned without decision.

In pursuance of the contemplated project, the lessees assigned the contracts to the Horn Diamond Coal Company, which in turn sublet their rights to the Modern Coal Company, which in turn sublet to the Southern Gem Coal Corporation, whose assets thereafter passed to the Interstate Coal Company for whom receivers were appointed in this cause, and to the receivers of which all rights to mine passed as a part of the assets of this estate. The sublease under which the Interstate Coal Company enjoyed possession provided for payment of royalty of four cents per ton. Obviously, the one cent per ton, constituting the difference between what the lessees originally agreed to pay the lessor and what the lessees were to receive from the Interstate Coal Company, represents the amount the lessors were willing that the lessees should receive for their efforts in bringing about the development of the coal property.

The mine was developed, shafts were sunk, tipples built, power plants constructed, entries driven as contemplated and the mine put in operation long before receivers were appointed in this court. The operation of the coal mine proceeded. Most, if not all, the improvements made for mining purposes are located on land other than that here involved. Unfortunately, industrial and financial conditions were such that it was impossible to find a purchaser for the property, and the court has continued the operation, when requested by the miners residing in the community. In the spring of 1932, the lessors, claiming that there was a default in payment of royalties in the sum of $1,635.30, notified the receivers that they were about to cancel the contracts and declare the same forfeited. The default then consisted of the minimum royalty of $2,400 for the year 1931, less certain sums paid, reducing the said amount to $1,635.30. Whether there was anything due for minimum royalty at that time, in the absence of an agreement that same should be applied against future earned royalties, is, as above remarked, doubtful. For the purpose of present disposition, the court accepts the figure. Promptly upon the service of notice of forfeiture the receivers filed their application for a temporary injunction herein. Upon hearing, the court enjoined the forfeiture of the contracts. It appeared that these contracts are valuable assets of the trust estate. They do not constitute all of the land leased for mining purposes, but include a major part of the same. A large amount of the acreage has been exhausted, but there remain substantial acreages to be mined. Miners were out of employment and demanding work, and the parties generally agreed that we should attempt to operate. The entire trust estate would have been irreparably injured had the injunction not issued. However, the court at that time expressly announced its determination that there should be no taking of coal without payment of royalties, and directed that this principle should be adhered to in the future operation of the mine, which at that season was idle.

Thereafter the operating receiver proceeded, in pursuance of an order of the court, to operate the mine and produce and sell coal. He was directed that in order that there should be no miscarriage of royalties he should pay all the royalties due the Horn Diamond Coal Company at four cents direct to petitioners, in order that the one cent additional royalty payable to the Horn Diamond Coal Company might be received by petitioners and applied by them upon the amount then claimed to be in default, as aforesaid, $1,635.30, growing out of the minimum royalties for 1931. There was a further minimum royalty, if such is proper under the contracts, for

the year 1932, of $2,400, accrued before the receivers resumed operation at the end of 1932. The total default, therefore, was $4,035.31.

■ The receiver proceeded with the operation, beginning with December, 1932, and ending with the month of July, 1934. The receiver produced from the mine 376,690 tons of coal. The royalties accruing under the contract, at the rate of three cents per ton, due petitioners, amount to $11,300.70, but in view of the direction of the court, the receiver had proceeded, with the co-operation of the Horn Diamond Company, to pay the entire royalty of four cents per ton to petitioners, so that instead of paying to petitioners during said time the earned royalties of $11,300.70, the receiver actually paid $15,095.90, including cash and coal, or an overpayment of $3,795.20, over and above the royalties actually due petitioners, under their contract. In addition to said balance, the Horn Diamond Company paid the petitioners $390.01, so that at the end of July, 1934, there had been paid to petitioners the total of $11,300.70, and by the receiver an additional $3,795.20 and by Horn Diamond Company $390.01, or, in all, an additional $4,185.21. The deficiency at the beginning of the period, the amount of which the court does not decide actually existed, but claimed by lessors, was $4,035.-31. The court at no time expressed any intention that the compensation to the lessors should be increased over and above the amount named in their royalty contract. It accepted the agreement of petitioners as to what was a reasonable royalty and expressed and intended merely to secure to the lessors that to which they were legally entitled. The sum represented by the additional royalty of 1 per cent. was intended to be paid to the lessors instead of the Horn-Diamond Company and was intended so to be applied, in order that the alleged default complained of by lessors could be credited under the court's provision and supervision. It was the intention that this 1 per cent. addition should be so applied, and it must be so applied at this time. Consequently, applying the overpayment of $4,185.21 upon the deficiency of $4,035.31 we find that said alleged deficiency has been completely wiped out and that a balance of $149.49 remains. This is the situation as of the end of July, 1934.

The petitioners seem to think that they were allowed such sums as were paid to them as compensation for use and occupancy, but the court at no time has heard any evidence as to what is the reasonable value of use and occupancy of this property. It has at no time attempted to make a new contract. It has attempted to preserve for the lessors their rights under their contracts and to assure to them payment in accordance with those contracts. The order of the court speaks, not of use and occupancy, but of royalties under the contracts; and it rather illy becomes lessors, whom this court has attempted to protect in their contract rights, to claim that the four-cent royalty was ordered paid to them, not in accordance with the contract, but as including a bonus for letting the receiver use their land. Such is not in accord with the facts nor the court orders. It would be a strange sort of chancellor who, in a time of depression, when incomes have decreased instead of increased, would, in the face of such facts, voluntarily say to the lessors, "you shall have more money than you agreed to accept."

Thus the situation at the end of July, 1934, was that the lessor was overpaid in royalties to the extent of $149.90, even if we accept as valid the claim of minimum royalties.

Subsequent to the end of July, 1934, and by the end of November, 1934, the receiver produced an additional tonnage of 61,-601 tons. The royalties accruing upon this, at three cents per ton, are $1,848.03. Upon this sum, the receiver has paid in coal $383.17, leaving a deficiency in his royalties, so far as petitioners are concerned, of $1,464.86. If we apply as against this the overpayment previously existing of $149.-90, we have a net deficiency at the time this petition was filed of $1,314.86. This is everything that could be claimed to have been due when the petition was filed seeking leave to forfeit the contracts.

■ This accounting includes $4,800 in minimum royalties, for which the receivers have mined no coal, and for which I am inclined to believe there was no consideration in the supplemental agreement. Equity requires that he who seeks equity must do equity, and if the petitioners are to be credited with $4,800 minimum royalties as have been credited in this accounting, there should be a stipulation by them that upon any further removal of coal as against earned royalties in excess of $4,800, that amount should be credited.

■ The immediate question confronting the court is whether it shall now permit the landowners to serve a notice of, and com-

plete, forfeiture, because of the deficiency in the last operation of $1,314.86. This operation ended with a loss. There are no funds out of which, at the present time, the deficiency can be paid, but it is obvious that if operation is resumed as contemplated, a continuation of the same plan of four cents per ton will soon wipe out the old deficiency, as well as pay accruing royalties. The question is largely a practical one of administration. The use of the coal lands in conjunction with that of others is absolutely essential to the preservation of the res of the estate. Petitioners are not to be deprived of their rights, but the court may postpone remedies and determine how and when remedies may be enforced. Certainly, this, a court of equity, administering for its cestui que trusts, is charged with the duty to conserve the estate and to refuse to permit a forfeiture of contracts and a complete loss of developed entries, rooms and air channels. It may not take from the bondholders, the holders of receivers' certificates and the other parties in interest the existing capital investment and hand it over to the lessors. Such action does not seem to me to be equity.

These lessors have received all royalties except a balance of $1,300. They have been paid minimum royalties, the validity of which the court doubts, and collected thousands of dollars prior to receivership. The court's receivers paid them several thousands of dollars before the operation herein concerned began. The amount of coal mined by the receivers prior to this operation was in excess of 627,000 tons. In a time of unprecedented depression there has gone to them over $15,000 in royalties from the operation here considered, including $4,800 minimum royalties for coal not mined. Petitioners now ask the court to decree that they may enforce the harsh legal remedy of a forfeiture, for the comparative inconsiderable default of $1,300, none of which may be actually due, if the parties are not entitled to a minimum royalty.

■ Courts of equity abhor forfeitures. Thus in Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, § 381, p. 707, it is said: "Wherever a penalty or forfeiture is inserted merely to secure the payment of money, or the performance of some act, or the enjoyment of some right or benefit, equity regards such payment, performance, or enjoyment as the real and principal intent of the instrument, and the penalty or forfeiture as merely an accessory, and will therefore relieve the debtor party from such penalty or forfeiture, whenever the actual damages sustained by the creditor party can be adequately compensated. * * * the principle, in this scope of its operation, is not confined to agreements; it has been extended so as to prevent the forfeiture of a tenant's estate under a clause of re-entry for the nonpayment of rent, or for the breach of some, though not of all, the covenants contained in a lease; and to prevent the enforcement of a forfeiture for the non-performance of conditions subsequent."

The same author said: "The following proposition seems to be a conclusion fairly drawn from all the decisions upon the subject, and to be an accurate and comprehensive statement of the general doctrine as settled by them, namely: In the absence of special circumstances giving the defaulting party a higher remedial right, a court of equity will set aside or otherwise relieve against a forfeiture, both when it is incurred on the breach of an agreement expressly and simply for the payment of money, and also on the breach of an agreement of which the obligation, although indirectly, is yet substantially a pecuniary one." So here it appears that if there is an actual deficiency, the same can be readily relieved by the action of the court in future operation, in providing for payment of larger royalties than the contract provides for.

■ True it is that the mine has been seriously damaged by a fire; that the improvements of the mine have been severely damaged by fire; but the files herein disclose that the court has authorized a lease to responsible lessees who have covenanted to rebuild and who are now engaged in rehabilitating the mine under the lease, the royalties from which will be sufficient to discharge any existing deficiency.

■ Petitioners insist that they should be allowed to forfeit these contracts and enter into contracts with other persons, but there is no evidence that they have any substantial prospects of any such contracts with other persons, or that there are any persons willing to invest capital for sinking shafts and developing such coal properties as these, as entities separate and apart from those owned by the Interstate Coal Company, now in possession of the re

ceivers, contiguous to and operated as part of a complete whole.

 Certain other facts are material. As appears from the files herein, of which the court takes judicial notice, the court has previously heard a petition of the receivers for sale. All persons were notified and heard, and the court directed a decree of sale and has entered a further order to show cause on or before the 18th day of January, A. D. 1936, why the decree of sale should not be entered. If the decree is entered, the property will be sold at an early date, and a court of chancery should not at this stage upset or destroy the integrity of the estate by permitting a forfeiture of the royalty contract. Such action is not consistent with equity or with the duties of a chancellor to the beneficiaries of an estate.

 The petitioners emphatically protest their absolute right to forfeit and cancel these contracts and insist that the court is depriving them of their legal rights. This cry had its origin in the plea of Shylock. I have pointed out a factual situation which I believe justifies the court's action in refusing at this time to dissolve the injunction. This mine is located in a community where the inhabitants are wholly dependent thereon for income. They have repeatedly and continuously besieged the court to keep the mine in operation, and it is for the best interests of the estate that the mine be operated until a sale can be had. Regarding these demands of petitioners, I might well use language previously used. The rule established by statute in bankruptcy cases, to the effect that all liens in third parties are recognized and preserved, is but declaratory of rights at common law and under the Constitution. Consequently, the same rule controls in receiverships in equity. But the rule does not require that the parties shall be left to the same remedies as existed before the jurisdiction of the court attached. A particular form of remedy is not within constitutional protection. Thus in Re Waggoner's Estate (D.C.) 206 F. 789, 792, the court said: "There is no principle more uniformly recognized and rigidly enforced by the courts than that valid liens, untainted by fraud, shall not be disturbed by the institution of bankruptcy proceedings. But this has reference entirely to the validity and obligation of the contract, and not to the remedies for enforcing the lienholder's rights. These can be changed without impairing the obligation of the contract. In re Williams' Estate, 19 A.B.R. 389, 156 F. 934, 84 C. C.A. 434; In re Utt, 5 A.B.R. 383, 105 F. 754, 45 C.C.A. 32; Matter of Huggins [(In re Harralson)], 24 A.B.R. 715, 179 F. 490, 103 C.C.A. 70, 29 L.R.A.(N.S.) 737." See, also, In re Jersey Island Packing Company (C.C.A.) 138 F. 625, 627, 2 L.R.A.(N.S.) 560, where the court said: "The remedy may be altered without impairing the obligation of his contract." See, also, Allebach v. Thomas (C.C.A.) 16 F. (2d) 853 (cert. den. 274 U.S. 744, 47 S.Ct. 590, 71 L.Ed. 1325); People's Bank v. Calhoun, 102 U.S. 256, 26 L. Ed. 101; Wiswall v. Sampson, 14 How. 52, 14 L.Ed. 322; Riehle v. Margolies, 279 U.S. 218, 223, 49 S.Ct. 310, 73 L.Ed. 669.

So here the court announces its decision as heretofore. It will recognize the validity of petitioners' contract. It will secure the performance thereof, so long as this cause remains in this court; but in the interest of preserving the integrity of the estate, in the interest of proceeding with operation until sale, so that the property may be sold as a going concern, and in the interest of keeping property intact, this court will maintain this injunction in full force and effect. It does not, in so doing, deny the rights of petitioners, but it does announce that the court, not the petitioners, will determine when and how those rights may be enforced, and that time and that manner will be such as to preserve the rights of petitioners with due regard for the principles of equity and without damage to them. Accordingly, the petition to vacate the injunctional order is denied.

The foregoing the court adopts as its findings of fact and conclusions of law.