In re ALCAP MFG. CO., Debtor.

NEW BRITAIN NATIONAL
BANK, Appellant,

v.

ALCAP MANUFACTURING
COMPANY, Appellee.

Civ. No. H–77–658.

United States District Court,
D. Connecticut.

Sept. 29, 1978.

Edward B. Scott, New Britain, Conn., for appellant.

Abraham S. Albrecht, Hartford, Conn., Schatz & Schatz, Hartford, Conn., for Debtor.

Timothy Sheehan, Rosenzweig, Fagan & Sheehan, New Britain, Conn., for Ahlco Mfg. Co., Inc.

Paul R. Salvage, Bacon, Cohen, Salvage & Fialky, Springfield, Mass., for Creditors' Committee.

Barbara Allen Babcock, Asst. Atty. Gen., Civil Division Dept. of Justice, Washington, D. C., Christine Macaluso, Commercial Litigation Section, Civil Division, Dept. of Justice, Washington, D. C., Richard Blumenthal, U. S. Atty., New Haven, Conn., Carl R. Ajello, Atty. Gen., State of Connecticut, Hartford, Conn., for intervening appellee.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This is an appeal by the New Britain National Bank [the Bank], as mortgagee, from an order of the Bankruptcy Judge, dated November 3, 1977, directing the attorney for the debtor in possession under a Chapter XI petition to withhold $19,128.16 from the amount realized on the sale of a parcel of mortgaged real estate as a contribution to the Referees' Salary and Expense Fund established by § 40(c)(4) of the Bankruptcy Act, 11 U.S.C. § 68(c)(4). The appeal is opposed only by the United States Attorney General who has intervened on behalf of the Administrative Office of the United States Courts.

■ The order in issue arose out of a petition under Chapter XI filed by Alcap Manufacturing Company [the debtor] on September 13, 1976. The filing of the petition operated automatically "as a stay of the commencement or the continuation of any court . . . proceeding against the debtor . . . to enforce any lien against his property." Bankr.Proc. Rule

11–44(a), 11 U.S.C. App. It does not appear in the record whether the Bank had received notice of this filing and the stay order included therein when, two days later, it instituted proceedings in the state court to foreclose three mortgages it held on the debtor's real property. These state proceedings, however, were halted by the Bank. Three months thereafter, on December 23, 1976, the Bank filed a complaint in the Bankruptcy Court to have the stay lifted.[1]

A time within which to answer the complaint was set, and trial on the Bank's complaint was scheduled for January 12, 1977. A hearing was held, but no decision was rendered because the Bank and the debtor had arrived at a stipulation. This was reduced to writing, executed, and approved by the Bankruptcy Judge on February 10, 1977. It was filed on February 11. The stipulation provided that the debtor was to make four monthly payments of $4,500 each to apply against his overdue indebtedness, and $1,000 to the Town of Cromwell toward past due taxes on the property to remedy a then-existing default under the mortgages. In the event of the debtor's failure to make the stipulated payments, the agreement provided that "judgment may enter *as of course* on the Complaint herein filed lifting the stay of any proceeding against the Debtor for the enforcement of the plaintiff's liens and *permitting the plaintiff to foreclose* its mortgages. . . . (Emphasis added.)"[2]

When the debtor failed to make the first payment as required by the stipulation, the Bank, on February 28, 1977, filed a motion for judgment pursuant to the stipulation. The general creditors asked to be heard, and a date for a hearing was set.

---

1. The rights of secured creditors are not affected by proceedings under Chapter XI. The provisions of Chapter XI are available only to debtors, and an arrangement thereunder is defined as a plan for the settlement, satisfaction or extension of the debtor's *unsecured* debts, upon any terms. 11 U.S.C. § 706(1).

2. The stipulation also provided that in the state foreclosure proceeding the debtor would stipulate for judgment of foreclosure and "for an immediate sale of the mortgaged premises and application of the proceeds of said sale to the expenses and costs of the proceeding, to the indebtedness prior in right to the plaintiff's mortgages, and then to the indebtedness of the Debtor to the plaintiff secured by said mortgages together with interest and costs."

What happened thereafter is not fully reflected by the record. The Bank's brief on this appeal states that the Bankruptcy Judge suggested that a sale of the mortgaged premises seemed to be desired by all parties, and that the Bankruptcy Court could carry it out. A memorandum in the file, in the handwriting of the Bankruptcy Judge, states cryptically, "Appl. for public sale to be filed and *Ordered*," and the Bank's motion for judgment was marked "off."

The Bank then filed a complaint for an order designating a proper person to sell the real property securing its mortgages free and clear of all liens except taxes and sewer charges due the town. An appropriate order was issued, and one Nathan B. Sweedler was designated as the auctioneer to sell the property. A public auction was held on May 25, 1977. The highest bid submitted was $630,000. After appropriate adjustments the cash payment amounted to $629,272.00. On May 26, the sale was confirmed. The following expenses were taken as deductions: $13,250.00 as a fee to the auctioneer, $2,704.77 for advertising, $1,000 to the appraiser, for a total of $16,954.77. The debt to the Bank was $612,588.88. What remained from the amount realized after those deductions was $612,317.23. The order being appealed here sought to deduct an additional $19,128.16 as a contribution to the Referees' Salary and Expense Fund. Neither the original plan of arrangement proposed by the debtor, nor any later amended plans, were ever confirmed by the Bankruptcy Judge. Instead, the Chapter XI proceeding was ultimately dismissed, and, on December 1, 1977, the debtor, upon consent, was adjudicated a bankrupt. *See* 11 U.S.C. § 776(2).[3]

The order is challenged on the grounds that it is contrary to the law, an abuse of discretion, and inequitable. Each of these contentions will be separately considered.

### I. *The Law Applied*

[2] In support of its argument that as a secured creditor it cannot be charged with any contribution to the Referees' Salary and Expense Fund, the Bank cites *In re Myers*, 24 F.2d 349, 351 (2d Cir. 1928), where the court stated:

"Finally, the mortgagee's share of the lien is not chargeable with the general expenses of administration of the estate, but only with a ratable proportion of the expenses of sale and of so much else as actually helped to preserve the property or its proceeds. *In re Williams' Estate*, 156 F. 934 (C.C.A. 9); *Seaboard Nat. Bank v. Rogers Milk Products Co.*, 21 F.2d 414, 417 (C.C.A. 2); *Aetna Life Ins. Co. v. Leonard*, 186 F. 148 (C.C.A. 5). The amendment of 1910 to section 48d of the Bankruptcy Act (11 U.S.C.A. § 76) did not affect this rule. *Gugel v. New Orleans Nat. Bank*, 239 F. 676 (C.C.A. 5); *Virginia Securities Corp. v. Patrick Orchards*, 20 F.2d 78 (C.C.A. 4)."

This rule was reaffirmed in *In re Rapid Motor Lines, Inc.*, 223 F.Supp. 469, 470 (D.Conn.1963), where Judge Timbers (now Circuit Judge) stated:

"[I]f the rule of thirty-five years' standing in this Circuit (*In re Myers, supra* ) is to be changed, that will have to be done by a court in the federal system other than this [federal court]."

The view of the Second Circuit is not universal. Some courts have adopted an exception to the rule such that "where the lienholder expressly or impliedly consents to a sale free of liens and encumbrances," he should be charged with a proportion of the expenses of administration. This is urged as the preferable rule in 4B *Collier on*

---

**3.** Title 11, United States Code, § 776(2) provides:

"[W]here the petition was filed under section 722 of this title, enter an order, upon hearing after notice to the debtor, the creditors, and such other persons as the court may direct, either adjudging the debtor a bankrupt and directing that bankruptcy be proceeded with pursuant to the provisions of this title or dismissing the proceeding under this chapter, whichever in the opinion of the court may be in the interest of the creditors: *Provided, however,* That an order adjudging the debtor a bankrupt may be entered without such hearing upon the debtor's consent."

*Bankruptcy* ¶ 70.99 at 1227–32, and cases cited in n.39 at 1230–32 (14th ed. 1978), and it is apparently the one the Bankruptcy Judge followed. In discussing the problem of allocating costs and expenses incident to a sale of secured property, *Collier* states at 1224–25,

> "Unfortunately, hardly any phase of the bankruptcy law has been plagued with so many inconsistent generalities, irreconcilable rules and principles, disagreements between circuits and even within circuits (apparently without any awareness thereof) and loose, indiscriminate statement of rules and citations of authority."

According to *Collier*, the root of the confusion among the cases can be traced to the 1910 amendments to § 48 of the Bankruptcy Act, 11 U.S.C. § 76, prior to which receivers and trustees were not entitled to commissions on property distributed to lienholders.

> "Although it has been generally admitted that the 1910 amendments to § 48 (as well as earlier amendments to § 40) were intended to furnish only the basis for computing the bankruptcy officers' additional compensation, and not necessarily to determine the source of payment, the presence of such provisions unquestionably influenced some courts in thereafter considering the lienholder's rights with less rigidity."

4B *Collier, supra*, at 1225–26. *See, e. g., Tawney v. Clemson*, 81 F.2d 300, 304 (4th Cir. 1936). But the *In re Myers* court was not so influenced. There, Judge L. Hand relied upon a pre-amendment decision, *In re Williams' Estate*, 156 F. 934 (9th Cir. 1907). That early case deals with a lienholder who voluntarily came into the bankruptcy court and asked that the property covered by its liens be sold by that court. The court rejected the "voluntariness" distinction adopted by some courts, and relied instead on the importance of the policy of preserving the priority of secured creditors and their immunity from the general costs of administering a bankrupt estate:

> "By coming into the bankruptcy court, therefore, the holder of a valid lien upon the estate of a bankrupt comes into an appropriate place and into a court amply able to enforce and protect his rights. By doing so the lienholder waives none of his rights. The enforcement of his lien in another court would entail[,] upon the proceeds of the property upon which the lien exists[,] the payment of the appropriate court costs; and so, in the enforcement of such lien in a court of bankruptcy, the proceeds of the property of the bankrupt upon which such lien exists is properly chargeable with the costs of such court appropriate to such enforcement, but with no other or further costs."

*In re Williams' Estate, supra*, 156 F. at 939.

To make it clear that the amendment to § 48(d) ought not be construed to permit exceptions to these fundamental policies of bankruptcy law, the *Myers* court cryptically stated:

> "The amendment of 1910 to section 48d of the Bankruptcy Act (11 U.S.C.A. § 76) did not affect this rule. *Gugel v. New Orleans Nat. Bank*, 239 F. 676 (C.C.A. 5 [1917]) . . . ."

*In re Myers, supra*, 24 F.2d at 351.[4]

While there may be two views as to whether the proceeds of a mortgagee's lien may be chargeable with the general expenses of administration of an estate, Congress has not as yet modified the existing legislation to favor either view. Even if I were not bound to do so, *see Lewis v. Rockefeller*, 431 F.2d 368, 371 (2d Cir. 1970), I would take the same view as that adopted

---

4. The citation to *Gugel* without further elaboration may seem parsimonious, but there was no reason for the court to go out of its way to repeat what the *Gugel* opinion sets forth in a thorough and well-reasoned explanation for construing the statute narrowly. The court stated, in part:

> "To give it this broader construction would have the effect of imposing on the lienholder the burden of the expense of the general administration of the bankrupt estate, in which he has no interest and from which he derives no benefit. We cannot think that Congress intended any such inequitable result."

*Gugel v. New Orleans Nat'l Bank, supra*, 239 F. at 678. *Accord, In re Schautz*, 390 F.2d 797, 800 (2d Cir. 1968).

in our Circuit. The Bankruptcy Judge, however, apparently adopted the alternative theory discussed in 4B *Collier, supra,* at 1225–26, and *Tawney v. Clemson, supra,* 81 F.2d 300, and took the somewhat disingenuous approach of ignoring the law in this Circuit. The rule of *In re Myers, supra,* 24 F.2d 349, requires reversal of the order appealed from.

## II. *The Discretion Exercised*

■ Even if it were the rule that "consent" of the secured creditor to a sale free of its lien should subject the entire proceeds to the fees for the Referees' Fund, the rule should not be applied in the instant case in view of the circumstances under which the Bank was induced to acquiesce to the sale. In the first place, the procedure by which an order "to sell property free of a lien" should have been sought was by a petition instituted by a party in an *adversary* proceeding. *See* Bankr.Proc. Rules 606(b)(3) and 701(3), 11 U.S.C. App. Had that been followed, the conclusion that the Bank consented would have had to be supported by findings of fact. *See* Bankr.Proc. Rule 752(a), 11 U.S.C. App. *See also, In re Pure Penn Petroleum Co.,* 188 F.2d 851, 854 (2d Cir. 1951); *In re 716 Third Ave. Holding Corp.,* 340 F.2d 42, 46 (2d Cir. 1964), *cert. denied sub nom. A. G. V. Associates v. Cross,* 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965). The filing of a complaint by the Bank in compliance with the ex cathedra order of the Bankruptcy Judge, "Appl. for public sale to be filed and *Ordered*," cannot fairly be held to constitute "consent" under the circumstances revealed by the file in this case. Just as the Bank cannot be penalized because it came into the Bankruptcy Court in the first instance in response to the automatic stay order, it cannot be estopped from denying any obligation to contribute to the Referees' Fund because it complied with the summary order of the Bankruptcy Judge.

The governing rule for relief from the automatic stay is set out in Bankr.Proc.

Rule 11–44(d), 11 U.S.C. App., the relevant portion of which reads:

> "The court may, for cause shown, terminate . . . such stay. A party seeking continuation of a stay against lien enforcement shall show that he is entitled thereto."

This last sentence is solidly grounded in law. As held in *Foust v. Munson S.S. Lines,* 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49 (1936), the position of the debtor is "not substantially unlike that of [a suitor] for injunction." *Id.* at 86, 57 S.Ct. at 95. In reliance upon *Foust,* Judge Frankel, in *In re Zeckendorf,* 326 F.Supp. 182, 184 (S.D.N.Y. 1971), held that "Referee Herzog may have been misled at the threshold when he placed the burden of demonstration and persuasion upon the movants [creditors]. The restraining order was never contested until now. No particular . . . showing of need was ever made for it. None has been made now. But the restraint is not a matter of right. *Foust v. Munson S.S. Lines, supra,* [299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49;] 8 *Collier on Bankruptcy* 254 (14th ed.)." After the debtor here defaulted under the stipulation, which the Bankruptcy Judge had approved, its provisions permitting the state foreclosure proceedings to go forward should have been honored immediately. *See Rosaly v. Gonzalez,* 106 F.2d 169 (1st Cir. 1939).

There was, so far as appears, no basis whatever for the refusal of the Bankruptcy Court to lift the stay. No one disputes, and there is no basis in the record for a dispute, that the debtor failed to comply with provisions of the stipulation. Further, it must be assumed that when the Bankruptcy Judge approved the stipulation, he was satisfied that the debtor was in default under the mortgages, that the mortgage liens were valid,[5] that the debtor had no defense to assert in a foreclosure proceeding, and also, that the continued possession of the mortgaged premises was not necessary to the functioning of the business of the debt-

---

5. The lien of the Bank was not subject to modification in a Chapter XI proceeding.

or.[6] That a foreclosure would not be disruptive of any prospective plan of arrangement also must be taken as established. All of these points are corroborated by the silence of the general creditors when the Judge suggested, at the hearing on the Bank's motion to enforce the stipulation, that a sale was desired by all parties. Nevertheless, the Judge failed to lift the stay.

In the absence of fraud, mistake or other equitable grounds,[7] the refusal to grant the Bank's motion undermined the sound policy of encouraging settlement of disputes between the parties. It is impossible for anyone to maintain respect for the courts if judges capriciously refrain from enforcing stipulations of record which they have formally approved.

■ Congress did not intend to make the removal of the automatic stay contingent upon the lienholder's agreement to sell encumbered property in a way which would subject the proceeds to a charge under the Referees' Salary and Expense Fund. Indeed, it is the established law that (with certain statutory exceptions not present here) all valid liens are a prior charge on the bankrupt's assets and usually must be satisfied in full before any payment of administrative expenses. *In re Tele-Tone Radio Corp.,* 133 F.Supp. 739 (D.N.J.1955). The "sale transferred the mortgage lien to the proceeds, and they should have been ordered paid to the lienors, subject at most only to deduction of the actual expenses of preserving the property and creating the fund by sale. The fund may not be charged with general expenses of administering the estate." *Seaboard Nat'l Bank v. Rogers Milk Products Co.,* 21 F.2d 414, 417 (2d Cir. 1927).

■ It may be argued that since the Bank consented to a sale in the Bankruptcy Court, it cannot complain of the fees which are required by statute. However, the only permissible effect which the so-called "consent" of the Bank should have under the foregoing circumstances is that which was given by the court in *Gugel, supra,* 239 F. at 679:

"In this case there was an apparent equity in the incumbered property to the bankrupt estate, and the District Court properly allowed the trustee the reasonable cost of selling the incumbered property, measuring it by the usual cost in the state court of foreclosing the liens.[8] The

**6.** It is worthy of note that the Bankruptcy Judge on February 10, 1977, at the request of the debtor, authorized a real estate agent to sell the same property. Apparently there was no concern in the court at that time that the property was essential to the debtor's ongoing business.

**7.** Throughout this proceeding there has been no suggestion of over-reaching or unconscionable exercise of superior bargaining power—or any equitable breach—by the Bank.

**8.** Although the Bankruptcy Judge had the power to choose who should conduct the sale, that did not carry with it the right to award auctioneer's fees greater than those usually awarded by the state court. The prevailing practice in the Connecticut state courts is to allow fees based upon actual services rendered. The file does not reflect any rational basis for an award of $13,250 for conducting a judicial public sale, and it is not easy to imagine any reasonable basis for such an exorbitant fee. This was not a case where an auctioneer was required to inventory and catalogue a multiplicity of items of merchandise and sell them to a galaxy of customers at varying prices. All that appears is that, in addition to drafting and arranging the publication of a few advertisements, on the day of the sale the auctioneer received bids for a single piece of improved real estate and submitted the bids to the Bankruptcy Judge for approval.

The amount for which the property was sold had no relationship to the kind or amount of services rendered by the "auctioneer." The calculation of the fee by a wooden application of the maximum rates permissible under the local rules, Dist. of Conn. Bankr. Rules 10(d), was inappropriate. Rule 10(d) provides:

"*Auctioneer and Compensation.* The court may designate an auctioneer to conduct the sale and allow him as compensation a sum equivalent to seven (7) per cent of the first $5,000.00, five (5) per cent of the next $10,000, three (3) per cent of the next $10,000, and two (2) per cent on all over $25,000.00. The auctioneer's commission shall be based only on the amount of cash received in the sale, and his actual disbursements shall be allowed only if supported by a sworn applica-

lienholder consented that the property be sold *on such terms,* when it accepted the service of the petition to sell free from liens. If the trustee is not entitled to his statutory commissions for general administration of the estate out of the proceeds of the sale of the mortgaged property, a fortiori the referee is not." (Emphasis added.)

■ The Judge erred in exercising his discretion in a way which effectively conditioned the removal of the stay on the Bank's consent to subject the proceeds to a contribution to the Referees' Fund. Since the application to terminate the stay order was in effect rejected for "an impermissible reason or for no reason at all," *Dunlop v. Bachowski,* 421 U.S. 560, 573, 95 S.Ct. 1851, 1861, 44 L.Ed.2d 377 (1975), its denial was an abuse of discretion.

### III. *Equity in the Bankruptcy Court*

Not only was the power of the Judge exercised erroneously, the way in which it was exercised was unfair to the Bank. The impropriety of ordering the sale in this particular instance appears to be the more egregious because the role of the Bankruptcy Judge had changed from a position of impartiality as a decider of disputes between the debtor and its creditors, to one where he was representing the Treasury of the United States. This position as an interested party is dramatized by the fact that the United States Attorney has intervened in the case and filed the only brief in support of the Bankruptcy Judge's order.

■ The unfairness to the Bank arose when the Bankruptcy Judge, acting on the government's behalf, failed to make the financial consequences clear to the Bank when he elicited a waiver of its right to enforce the stipulation. The courts here, as in a number of other areas, have adopted rules which impose a duty upon a judge to insure that a person who is brought before him is fully informed of any adverse consequences which may result from his consent to the proceedings. *Cf., e. g.,* Fed.R.Crim.P. 11(c), (advice to defendant before accepting a plea of guilty); *id.,* 11(d), (insuring that the plea is voluntary); *United States v. Jacobs,* 547 F.2d 772 (2d Cir. 1976) (witness before a grand jury must be warned that he may be a target of the investigation). These rules are based on judicial concern that the integrity of the courts shall be maintained.

■ Since the Bankruptcy Judge here knew that he was going to assess a contribution to the Fund against the net proceeds received from the sale, and that no such assessment would occur if the Bank asserted its right to a sale in the state courts, as a court of equity he had a duty to inform the Bank of the heavy financial consequence of its consent to such a sale in the bankruptcy proceedings. *In re Etherton,* 88 F.Supp. 874 (S.D.Cal.1950), supports the view that a bankruptcy court is under an equitable duty to notify interested parties of matters affecting their substantial rights. In that case the lien creditor brought to the attention of the bankruptcy court, trustee, and creditors that he was claiming a mechanics lien. Because he did not bring suit to enforce the lien thereafter in the state court within the applicable statute of limitations period, the bankruptcy court rejected his claim as a secured creditor on the ground it had lapsed under state law. The bankruptcy judge, therefore, held that the lien creditor should have applied in the bankruptcy proceeding for permission to sue. The district court reversed stating:

"The court in bankruptcy could *allow the claimant to proceed with foreclosure.* He did not apply for such permission.

---

tion or by affidavit showing the detail of expenses incurred."

Further, if the sale had been conducted by a trustee, he would have received no compensation. Rule 10(g) provides:

"When the trustee acts as auctioneer he shall receive no compensation therefor in excess of that provided by the Act for trustees."

Even-handed treatment would justify only an award based upon time spent, at a reasonable hourly rate, which is the practice in judicial sales ordered by the state courts. Since the award to the auctioneer rested on an infirm order of sale, as shown in part II of this opinion, reconsideration of that award is appropriate. *See Gugel, supra,* 239 F. at 679.

Instead, he chose the alternative of bringing the lien to the attention of the bankruptcy court *by asserting it as a secured claim.* The bankruptcy court being a court of equity, it was its duty, if the claimant *had chosen the wrong remedy,* to tell him, 'This is the wrong way to proceed. You had better apply for *permission to sue.*'

"The estate *would not have benefited* by a foreclosure suit, which would have only added to the costs of administration. Therefore, when the lien-claimant filed his claim, he gave notice to the bankruptcy court that he was claiming the benefit of his lien. The bankruptcy court, being an equity court, should not have rejected his claim, merely because he had chosen the wrong way of calling it to the court's attention. The claimant should not have been penalized and deprived of a statutory and constitutional lien because of erroneously chosen procedure. More, I know of no other way in which he could have brought the fact to the attention of the court, except by seeking permission to sue."

*Id.* at 878 (emphasis in original).

The *Etherton* court's sense of the equities is even more compelling in the instant case. In *Etherton* the detriment to the secured creditor inured to the benefit of the general unsecured creditors. In this case, the se-cured creditor, the Bank, was led to agree to a method which resulted in a benefit only to the United States Treasury. The *Etherton* case was followed in *National Bank & Trust Co. v. Allied Supply Co.,* 386 F.2d 225 (4th Cir. 1967). In both of those cases, the proper way for the secured creditor to proceed could have been ascertained had the creditor researched the applicable law. In this case, the Bank had no way of knowing that the Bankruptcy Judge was going to rule, on a matter of statutory construction, in a way contrary to the existing law in this Circuit. On the other hand, because the Bankruptcy Judge well knew that "consent" to sale free of the mortgages would impose a heavy charge on the proceeds for administrative expenses,[9] he constructed a strategic trap, *cf. United States v. Ruffin,* 575 F.2d 346 (2d Cir. 1978), for the Bank when he "permitted" it to sell the property in the bankruptcy proceedings.

■ The Bankruptcy Court is a court of equity and should be guided by equitable doctrines and principles except insofar as they are inconsistent with the Act. *S.E.C. v. U. S. Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *Braddy v. Randolph,* 352 F.2d 80, 84 (4th Cir. 1965). The sale free and clear did not yield enough to pay the indebtedness to the Bank. To permit the government to further diminish the amount which was re-

---

**9.** Serving as a discussion leader at the Fifth Seminar for Referees in Bankruptcy, the Bankruptcy Judge here gave an opening statement on costs of administration during the course of which he gave an example which cannot be distinguished from this case:

"The contribution to the referees' salary and expense fund is computed on the 'net proceeds realized.' Time does not permit an extended discussion of the meaning of net proceeds. I will merely give one or two examples which illustrate the principle. Frequently real estate is sold with existing encumbrances to be paid out of the proceeds. For example, a house is sold for $15,000.00 with $12,000.00 of mortgages to be paid off. Is the net realization $3,000.00 or $15,000.00? It depends altogether upon how the transaction is handled. If the closing is by a title insurance company and the trustee receives a check for only $3,000.00, the net realization is $3,000.00. On the other hand, if the trustee receives $15,000.00 and simultaneously issues checks to pay off the mortgages, the payment of $12,000.00 on the mortgages is treated as having been paid to secured creditors and the net realization is the full $15,-000.00. A caveat however! In the latter case the entire $15,000.00 must be deposited in a bankruptcy account and the checks for $12,000.00 drawn from this account. Since funds may be disbursed only by check (Section 47a(4)) countersigned by the referee (General Order 29), and the trustee's commissions are computed on the funds he disburses (Section 48c(1)), you will need to advise the trustee only once as to the proper procedure."

Seidman, *The Hierarchy of Section 64 of the Act, Proceedings of the Fifth Seminar for Referees in Bankruptcy,* 16, 18 (1968). One might note that the Judge's ironic observation in the final sentence of the quoted statement reveals what is apparently an attitude of undue concern with the personal pecuniary interests of those charged with fiduciary and public trust.

alized by over $19,000 for its benefit at the expense of the Bank would be flagrantly inequitable.[10]

The interest of the government in making certain that the Bankruptcy Court shall maintain its character as a court of equity is more important than its interest in obtaining fees, especially when the fees are obtained in a way other than one which is genuinely fair. For all of the foregoing reasons, the order is reversed and the case is remanded for further proceedings in accordance with this opinion.

SO ORDERED.

---

**10.** Furthermore, as the Bankruptcy Judge noted in his memorandum explaining his order, the order depended upon a dual contingency:

"The debtor has not yet filed a plan, and it is uncertain at this date whether an arrangement will be confirmed. In a confirmed Chapter XI case, there is no charge calculated on payments to *secured* creditors. If the plan is confirmed, the expense charge will be limited to special charges, such as notices of the auction, [and] photocopies of documents relating to the sale. If, on the other hand, an adjudication is entered, [but see text accompanying note 3, *supra* ] the sale price would constitute part of the net realization."

This was a recognition of the fact that Congress has taken some pains to maintain a distinction which limits the encroachment of Chapter XI into the field of liquidation. Since an adjudication in bankruptcy had not yet arisen, and there was no assurance that it would, the posture of the case was still in Chapter XI. The effect of the order was "speculative, based upon the expectations of those who have everything to gain and nothing to lose." *In re Murel Holding Corp.,* 75 F.2d 941, 942 (2d Cir. 1935). Further, "[i]t amounts to a freezing of assets, while it is in effect, a condition which is not consistent with that degree of liquidity requisite in any financial organization engaged in the acceptance of investment of the funds of many members of the public." *In re Holiday Lodge, Inc.,* 300 F.2d 516, 520 (7th Cir. 1962). The only interest contrary to that of the Bank seems to have been the purely pragmatic, administrative one of enlarging the fees for the courts.