**L. E. DURAND, Trustee in Bankruptcy of Turney Wood Products, Inc.,**
**Plaintiff,**

v.

**NATIONAL LABOR RELATIONS BOARD; John J. A. Reynolds, Jr., Regional Director, Twenty-sixth Region National Labor Relations Board; Melvin Pollack, Trial Examiner; Carpenters Local Union 2746; United Brotherhood of Carpenters and Joiners of America, AFL–CIO; Celia Warren, Horace Vernon Dodson, and Artis Ford, Members of Local 2746, Defendants.**

**Leon Davis, Elliott Davis, P. C. Dixon and Emby Kaye, Intervenors.**

**In the Matter of TURNEY WOOD PRODUCTS, INC., Bankrupt.**

**Nos. H–68–C–9, H–68–B–5.**

United States District Court
W. D. Arkansas,
Harrison Division.

Feb. 13, 1969.

Eugene R. Warren and D. D. Panich, Little Rock, Ark., for plaintiff.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., John F. Harrington, Regional Atty., NLRB, Memphis, for NLRB.

Philip E. Kaplan, Little Rock, Ark., for Union and its members.

C. Richard Crockett, Little Rock, Ark., for intervenors.

### Memorandum Opinion

HENLEY, District Judge.

Subject litigation represents another phase of a continuing labor controversy involving the affairs of the now bankrupt Turney Wood Products, Inc. of Harrison, Arkansas. The controversy erupted in the spring of 1968 when Turney was adjudicated a voluntary bankrupt and when L. E. Durand was appointed its receiver to continue the operation pending liquidation, as authorized by section 2 a(5) of the Bankruptcy Act. The Receiver, with the approval of the Referee in Bankruptcy, rejected a collective bargaining agreement between Turney on the one hand and Local Union No. 2746, United Brotherhood of Carpenters and Joiners of America, AFL-CIO, on the other hand, and proceeded unilaterally to reduce wages and employee force and to recall persons to work without regard to seniority.

The actions of the Receiver, who later became Trustee and who will be referred to as such, caused the Union to file unfair labor practice charges with the National Labor Relations Board and also to file a suit in this Court under the provisions of section 301 of the Taft-Hartley Act, 29 U.S.C.A. § 185, to compel the Trustee to submit the differences between him and the Union to arbitration as provided by the collective bargaining agreement. The Union also sought review of the order of the Referee authorizing the Trustee to reject the contract. On June 28, 1968, the Court dismissed the section 301 suit and denied the petition for review. Local Union No. 2746 etc. v. Turney Wood Products, Inc., W.D.Ark., 289 F.Supp. 143. There was no appeal from the decision of the Court, and right or wrong it has become final.

Thereafter, the National Labor Relations Board issued its complaint against the Trustee charging that he had been guilty of certain specified unfair labor practices. The case was assigned to a Trial Examiner of the Board who conducted hearings on the complaint over the objection of the Trustee who urged that in view of the pending bankruptcy proceeding the Board was without jurisdiction.

On September 28, 1968, the Trustee commenced in this Court Civil Action No. H–68–C–9 against the Board, its Regional Director, the Trial Examiner, the Union, and three former employees of Turney seeking to enjoin further proceedings before the Board in connection with the unfair labor practices complaint. The defendants in that case deny that the Trustee is entitled to relief.

In October 1968 the Regional Director of the Board filed in the original Turney bankruptcy case, H–68–B–5, what amounts to an application for an order requiring the Trustee to earmark the sum of $80,000 of moneys in his hands as a fund to satisfy any back pay awards that ultimately may be made by the Board in the proceeding before it.

The complaint of the Trustee and the application of the Regional Director were

heard together at Harrison on November 25, 1968, and both matters have been submitted on documentary material, briefs, and oral argument. The Court has delayed disposition of the issues presented in the hope that the parties could settle the dispute between them, and while efforts have been made in that direction, they have not been successful.

The questions presented are somewhat unusual and are not without public interest; further, the controversy has produced a significant adverse effect on the economy of the section of North Arkansas in which Turney formerly operated.

For many years prior to March 1968 Turney was engaged in the business of manufacturing and selling church furniture which moved in interstate commerce. There is no question that Turney was an industry "affecting" interstate commerce, and that it was subject to the provisions of the National Labor Relations Act, 29 U.S.C.A., § 151 et seq., and of the Taft-Hartley Act, 29 U.S.C.A. § 185 et seq.

For a number of years the Union which has been identified was the certified collective bargaining agent of Turney's plant employees. Turney and the Union operated under a number of collective bargaining agreements, the last one of which was entered into in 1966 and was to expire in 1969. As is usual, that contract prescribed wage rates and governed conditions of employment; it specified that lay-offs and recalls to work would in general be governed by employee seniority; and it set forth a grievance procedure which included compulsory arbitration as the final step. As of early March 1968 Turney employed about 165 people who were covered by the collective bargaining agreement.

Turney's assets were heavily encumbered. The Small Business Administration held a first mortgage securing a large debt. Messrs. Davis, Kaye, and Dixon of Texas and Oklahoma held a second mortgage which also secured a large obligation, and which covered Turney's accounts receivable as well as the physical assets of the business.

By March 1968 Turney was in straitened financial condition and realized that it could not meet the payroll which fell due on March 15. Management advised the employees of the situation and requested them to work temporarily without pay in the hope that conditions would improve. No significant number of the employees were willing to work gratis, and the plant did not reopen on March 18.

On March 22 Turney filed a voluntary petition in bankruptcy and was immediately adjudicated. It was decided that the plant should be operated pending liquidation, and Mr. Durand was appointed Receiver.[1] He was authorized to reject the collective bargaining agreement as an executory contract as provided by section 70 b of the Bankruptcy Act and to hire employees and fix their compensation, subject to the approval of the Referee.

Durand promptly exercised that authority. He reopened the plant with a substantially reduced force hired at substantially reduced wages. Employees were recalled to work without regard to seniority, and the Trustee notably did not recall to work three individuals, named as defendants in the civil action before the Court, who had substantial seniority and who had been active in Union affairs.

Following the Court's dismissal of the Union's section 301 suit, the Turney plant was sold as a going concern to Independent Stave Co. of Lebanon, Missouri, the sale being made free of liens. Independent paid the Trustee $110,000 in cash and assumed the obligation to SBA amounting to $239,060.33; the Trustee retained the accounts receivable which as stated, are subject to the second mortgage of Davis, Kaye, and Dixon.

The face value of the accounts receivable was $386,107.24. As of November 20, 1968, the Trustee had been able to

---

1. Case No. H–68–B–5 has never been anything but a straight bankruptcy proceeding; reorganization has never been attempted or contemplated.

collect only $67,134.36 on those accounts, and while there have been some additional collections, it is clear to the Court that the accounts still outstanding are essentially valueless and uncollectible.

In addition to selling the plant as a going concern, the Trustee was able to sell certain specific items of personal property and to dispose of certain securities of small value, deriving thereby an additional sum of approximately $20,000.

As of the date of the November 1968 hearing in Harrison, the taking of testimony before the Trial Examiner of the Board had been completed, and he had the unfair labor practices complaint under advisement. In connection with the Regional Director's request in the bankruptcy case for an impounding order, counsel for the Board advised the Court that the Regional Director had concluded tentatively that the potential back pay awards would be subject to mitigation to the extent of about 50 percent, and in open court counsel amended the request for an impounding order so as to reduce the amount sought to be impounded from $80,000 to about $41,000.

On February 2, 1969, the Trial Examiner filed his decision incorporating his findings of fact, conclusions of law, and recommended order. He found that the Trustee had been guilty of certain prohibited unfair labor practices, and his recommendations include back pay awards which, if approved by the Board and enforced by the Court of Appeals, will or may inure to the benefit of about 42 former employees of Turney, including the three individuals mentioned heretofore.

The employees of Turney who worked during the two weeks ending on March 15, 1968, and who were not paid for that work have wage claims which are entitled to second priority under section 64a(2) of the Bankruptcy Act. Two hundred twenty-nine of such claims have been filed, and they total some $79,000. It is to be observed that probably all of the 42 people who might profit from the recommended back pay awards have liquidated second priority claims for the work actually done by them before the closing down of the plant immediately prior to bankruptcy.

The significance of the observation just made lies in the fact that the Regional Director insists that the back pay awards, if established ultimately, will amount to post-bankruptcy "wages," and will be entitled to section 64 a(1) priority as "expenses of administration." If the Regional Director is correct, the back pay awards, which may or may not be established finally at some indefinite future time, would come ahead of the claims of the same former employees for compensation for work actually performed and about which there is no dispute.

The secured creditors claim that their lien takes precedence over the section 64 a(2) claimants and also over any back pay awards that may be made even if they are accorded section 64 a(1) priority. The Court is advised that there is a potential dispute between the secured creditors and the Trustee as to whether, in view of certain equities claimed to exist in this particular case, the secured claim should be subordinated to the section 64 a(2) claims. However, that controversy has not materialized yet and may never do so; and nothing said herein should be considered as a prejudgment of that dispute.

Were it not for the pendency of the proceeding before the Board, the Trustee would now be in a position to disburse the funds in his hands and turn the uncollected accounts receivable over to the secured creditors. But in view of the pendency and potentialities of the proceedings before the Board he fears to take those steps without judicial protection and for that reason he commenced his injunction suit against the defendants in No. H–68–C–9.

Apart from the impact of the administrative proceedings upon the bankruptcy case, those proceedings appear to have had a collateral effect on Independent Stave Co. It is evident from a reading of the decision of the Trial Examiner

that an effort may be made to hold Independent liable for the alleged misconduct of the Trustee on the theory that Independent is a "successor employer." And it is the Court's information that Independent for that reason has been unwilling to put the plant into operation except on a minimal scale. Consequently, a substantial number of persons, including former employees of Turney, who might well be employed by Independent are not working at all.

It is evident that the assets of the estate are not sufficient to pay in full the secured claim and the section 64 a(2) claims; *a fortiori*, the assets are insufficient if back pay awards are super-added to the claims already on file. If the secured claim takes precedence over the section 64 a(2) claims and also takes precedence over any ultimate back pay awards, and if the secured creditors insist on their rights, none of the laborers will get anything. Aside from that, if funds are impounded to satisfy any ultimate back pay awards, it is clear that the section 64 a(2) claimants cannot be paid anything at this time. Judicial notice may be taken of the fact that proceedings before the Board and review or enforcement proceedings in the courts are protracted and expensive, and to the extent that expenses of litigation are paid out of the bankruptcy estate, the burden will fall ultimately on the former employees of the bankrupt or on the secured claimants.

In the circumstances which have just been outlined it seems obvious to the Court that the parties ought to lay to one side their personal feelings and ideologies, come to some kind of a financial settlement with which they can live, let Independent negotiate a new contract with the Union, let the plant be reopened, and let employment and production proceed. Unfortunately, the Court thinks that it has observed in this case an attitude on the part of some of the parties to ignore practicalities and to use this litigation involving a completely defunct business as a framework within which to vindicate abstract principles of labor-management relations, collective bargaining and Board jurisdiction. That approach, in the Court's view, is not going to be of any practical value whatever to the individual former employees and may cause them ultimate harm.

However, all that is neither here nor there. The cases are before the Court, and it is the Court's duty to decide the issues presented to it.

In No. H–68–C–9 the position of the plaintiff Trustee is that the administration of the Turney estate is within the exclusive jurisdiction of the bankruptcy court, and that the Board has no jurisdiction of the Trustee or of the unfair labor practices complaint against him. In addition, the Trustee contends that the proceedings before the agency amount to nothing but an impermissible attempt to relitigate the same issue presented in last year's section 301 case.

The Board disavows any intent to ignore, review, or reverse this Court's 1968 decision to the effect that an operating Trustee has the power under section 70 b of the Bankruptcy Act to reject a collective bargaining agreement. The Board contends that the complaint issued by it charges unfair labor practices committed *after* the contract was rejected, and that it is within the exclusive jurisdiction of the Board to pass upon the Trustee's alleged practices, subject to judicial review in the Court of Appeals and in the Supreme Court of the United States.

In the bankruptcy case the position of the Board, as indicated, is that the potential back pay awards will take section 64 a(1) priority, and the Board also must contend necessarily, if the potential awards are to have any practical significance as far as Turney is concerned, that those awards come ahead of the secured claim.

The Trustee denies that the potential awards have any particular priority, and the secured creditors emphatically deny that the potential awards would be superior to their claim.

In evaluating those contentions it should be recognized that we are dealing here with two separate bodies of federal law, standing side by side. We have, on the one hand, federal labor law which is concerned with labor-management relations and with preserving fair dealing and industrial peace in industries affected by that law. On the other hand, we have the federal Bankruptcy Act which is concerned with debtor-creditor relationships and rights and with the administration of estates in bankruptcy or reorganization. Each of those fields of law is a specialized one, and persons having day to day familiarity with one field may have little familiarity with or expertise in the other.

The National Labor Relations Act and the Bankruptcy Act are both constitutional exercises of Congressional power. When in a given situation the two Acts come into contact with each other, they should, if possible, be so construed and applied as to avoid conflicts between them; and the tribunal concerned, whether court or agency, should be careful not to trespass upon the jurisdiction of some other tribunal.

As far as unfair labor practices are concerned, the jurisdiction of the Board is exclusive, subject to review by the federal appellate courts; in that field the federal district courts, including the bankruptcy courts, are without jurisdiction. And it is thoroughly established that a federal district court is without power to enjoin the Board from entertaining an unfair labor practice complaint even where it is contended that the Board is acting in excess of its jurisdiction. Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 58 S. Ct. 459, 82 L.Ed. 638. If the Board exceeds its jurisdiction or if it makes an erroneous decision, the injured party can secure relief in the Court of Appeals or in the Supreme Court.

In a bankruptcy case the United States District Court, sitting as a court of bankruptcy, has exclusive jurisdiction of the bankrupt and his estate for many purposes. However, Congress has not seen fit to insulate a receiver or trustee in bankruptcy from the jurisdiction of the National Labor Relations Board as far as unfair labor practices are concerned. Section 10(a) of the National Labor Relations Act, 29 U.S.C.A., § 160 (a), confers upon the Board the power to prevent "any person" from engaging in unfair labor practices, and section 2(1) of that Act, 29 U.S.C.A., § 152(1), expressly includes trustees in bankruptcy and receivers in its definition of "person."

In its original opinion in this litigation the Court recognized that an operating trustee in straight bankruptcy may be subject to the provisions of the National Labor Relations Act, and it follows that if such a trustee commits an unfair labor practice he is subject to the jurisdiction of the Board, notwithstanding the fact that he is an officer of the bankruptcy court, and the fact that the business of the bankrupt is being administered in a sense by the court through its officer. National Labor Relations Board v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39; National Labor Relations Board v. Bachelder, 7 Cir., 120 F.2d 574; In re American Business, Inc., D.C.Neb., 151 F.Supp. 877. The Court, therefore, cannot accept the argument of the Trustee that his status as such takes him out of the jurisdiction of the Board, or that the proceeding before the Board per se infringes upon the bankruptcy jurisdiction of this Court.

A single labor dispute may fall in part within the section 301 jurisdiction of the federal court and in part within the unfair labor practices jurisdiction of the Board. In such a situation a delicate question may be presented if the Board in processing an unfair labor practice charge threatens to decide in one way a legal or factual question which the court, in the exercise of its section 301 jurisdiction, has already decided in another way. In that situation it is at least arguable that notwithstanding the general rule that the court is without power to restrain the Board in the exercise of

its jurisdiction, the court may nevertheless enjoin the administrative proceeding for the purpose of protecting its own jurisdiction and judgment.

The complaint in Local Union No. 2746 etc. v. Turney Wood Products, Inc., supra, did not contain any allegations to the effect that the Trustee ` had been guilty of any unfair labor practices, as such. Had the complaint contained such allegations, the Court would have had no jurisdiction to pass upon them. All that the complaint in that case alleged was that the action of the Trustee in rejecting the collective bargaining agreement constituted a breach of that agreement, and that the Union was entitled to have the agreement specifically enforced. What the Court held, and all that the Court held, was that the rejection did not amount to a breach, and that the Union was not entitled to specific performance.

■■■ It is well settled that a breach of a collective bargaining agreement is not per se an unfair labor practice, although it may be. With respect to conduct which amounts to no more than a breach of contract, the Taft-Hartley Act gives an exclusive judicial remedy consisting of a suit under section 301 of that Act. With respect to conduct amounting to a statutorily defined unfair labor practice, the jurisdiction of the Board is exclusive. See Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842; Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246; Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 489, 99 L. Ed. 510; Myers v. Bethlehem Shipbuilding Corp., supra; National Labor Relations Board v. George E. Light Boat Storage, Inc., 5 Cir., 373 F.2d 762; Lodge No. 12, District 37, Int. Ass'n of Machinists v. Cameron Iron Works, 5 Cir., 257 F.2d 467.

In the proceeding before the Board the theory of the agency is that even if the Trustee had a right to reject the contract, a right which the Trial Examiner "assumed" in his decision, he still had no right unilaterally to reduce wages, or to ignore seniority, or to discriminate against individual employees on account of union activity, or to refuse to recognize the Union as the bargaining representative of the employees.

To put it another way, the theory of the Board is that the Trustee actually gained nothing concrete or of immediate value to him when he rejected the contract. Conceding that the Trustee had a right to reject the contract, the Board says that he was still required to operate under its terms while bargaining with the Union for a new contract, and that he was guilty of one or more unfair labor practices when he took the unilateral action which has been described.

One of the charges set forth in the complaint issued by the Board and upheld by the Examiner is that in refusing to reemploy the individuals, Warren, Dodson, and Ford, the Trustee discriminated against them on account of prior union activity. The Court has no trouble with that charge as a charge. For the rest of it, the Court thinks that when the Board says that an operating trustee must operate under the terms of a collective bargaining agreement which he inherits unless and until he can negotiate a new one, it is coming very close to saying that the trustee has no authority to reject the contract in the first place, which would be directly contrary to the earlier holding of this Court.

■ However, the Court is not convinced that the Board is proposing to relitigate any issue heretofore decided by this Court, and the Court will not assume that the Board ultimately will undertake to avoid the impact of this Court's decisions by disingenuous characterization of its own problems. Hence, it appearing that there is no necessary conflict between the Board's exercise of its unfair labor practices jurisdiction and the prior decision of this Court in the exercise of its section 301 jurisdiction,

further proceedings before the Board will not be enjoined.

██ Turning now to the application of the Regional Director in the bankruptcy case for an order impounding funds, it is clear that a claim in bankruptcy based upon a back pay award made by the Board is the property of the Board which holds the proceeds of the award in trust for the benefit of individual employees or former employees, and that it is the function of the Board rather than of the bankruptcy court to liquidate the award. Nathanson v. National Labor Relations Board, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23; National Labor Relations Board v. Killoren, 8 Cir., 122 F. 2d 609.

██ "Wages" earned after bankruptcy and during operation of the business by a receiver or trustee are deemed to be expenses of administration within the meaning of section 64a(1). Collier On Bankruptcy, 14th Ed., ¶ 64.202 [3] and cases there cited.

██ A claim based upon a back pay award for the period immediately preceding bankruptcy is considered to be a claim for wages for section 64 a(2) purposes, Nathanson v. National Labor Relations Board and National Labor Relations Board v. Killoren, both supra. And the Court will assume *arguendo* that a claim based upon a back pay award for a period following bankruptcy qualifies as wages for the purpose of section 64 a (1). The Court cannot forbear saying, however, that in this case the Court's assumption creates a situation where the potential back pay awards in favor of the 42 involved employees based on a period of time during which they did not work will have a higher priority in bankruptcy than their liquidated claims under section 64 a(2) for compensation for time during which they actually worked. That situation is somewhat ironical to say the least.

However, to say that the potential back pay claim will have section 64 a(1) priority by no means establishes that the Regional Director is entitled to have funds earmarked to pay that claim when and if it matures. In seeking to have funds impounded on the basis of section 64 a(1) priority, the Director seems to have assumed tacitly that expenses of administration take precedence in bankruptcy over secured claims. That assumption is valid only to a limited extent, and the Court is convinced that it is not valid here.

██ It is a well established principle of bankruptcy law that the "priority claims" recognized by section 64 a, including expenses of administration, do *not*, in general, take precedence over liens which are valid against the Trustee, as is the lien of the secured creditors in this case. Collier, op. cit. ¶¶ 64.02 [2], 67.27 [1].

According to Collier, there are two exceptions to that general rule. Some exceptions are to be found in the application of section 67 c of the Act which has nothing to do with this case. Others consist of "costs of administration which actually benefit the lien interest"; those costs are to be paid out of the funds available for the lien so benefitted. Collier, op. cit., ¶ 64.105 [1.4].

The same author says (Collier, op. cit., ¶ 67.27 [1]):

" * * * The general rule that lienors should not have to bear the costs and expenses of a bankruptcy proceeding, which are the first items to be paid under § 64a, has usually, however, been subject to the limited exception that where the lienor has invoked the aid of the bankruptcy court in enforcing his lien or where the bankruptcy court properly sells the property free of liens, the lienor is chargeable with his share of the direct and necessary expenses of preserving and realizing the security * * *."

Here, the secured creditors have participated in the bankruptcy proceedings and have benefitted from them, including the operation of the business after bankruptcy, and the property was properly sold free of lien. There is no question that the expenses of administration actu-

ally paid or incurred up to this time have directly and substantially benefitted the lien interest, and the secured creditors do not contend otherwise. The same thing cannot be said about the potential back pay awards. Taking money out of a bankruptcy estate to pay back wages to persons who did not work is certainly of no benefit to the estate or to security interests therein; on the contrary, such a course is in the highest degree detrimental to the estate and to secured creditors. Moreover, it must be remembered that the collective bargaining agreement here involved was rejected by the Trustee, not by the secured creditors; nor are the secured creditors chargeable with the unfair labor practices, if any, committed by the Trustee. In the Court's estimation any claim that a back pay award in this case should take precedence over the secured claim is completely without equity.

Since the assets in the hands of the Trustee are not sufficient to pay the actual administration expenses which have accrued and to satisfy the secured claim in full, it follows that in no event will any estate money be available to satisfy a back pay award if it is made, and no purpose is to be served by directing the Trustee to withhold or earmark for that purpose funds belonging to the secured creditors. Accordingly, the application of the Regional Director will be denied.

In No. H–68–C–9 a judgment will be entered dismissing the complaint. In No. H–68–B–5 an order will be entered denying the application of the Regional Director and directing the Trustee to proceed to liquidate the estate and distribute the assets. It occurs to the Court that the secured creditors may desire to have the Trustee continue to resist the proceedings before the Board; if so, and if the secured creditors are willing to bear the expense of further proceedings before the Board and in the appellate courts, the Trustee will cooperate. However, the Trustee will not be authorized to spend any more estate money in connection with administrative proceedings.