**In the Matter of Manuel Wilson HULL and Marie M. Hull, Debtors.**

United States District Court,

**Nos. 31475, 31476.**

E. D. California.

Feb. 27, 1970.

Fred G. Meis, Meis & Cincotta, San Francisco, Cal., for petitioners.

Irvine P. Dungan, Sacramento, Cal., for debtors.

Richard L. Carico, Asst. U. S. Atty., for the Government.

## MEMORANDUM AND ORDER

MacBRIDE, Chief Judge.

This is a petition for review from an order of the Referee in Bankruptcy in arrangement proceedings under Chapter XI of the Bankruptcy Act. The Referee ordered the distribution of monies realized from the sale of the Bret Harte Inn which was the principal asset of the debtors. The petitioners for review are L. E. Weisenburg, Jr. and Oliver Kullberg, both secured creditors. Weisenburg held a mechanic's lien in the amount of $43,281.30 for labor and materials supplied to the Inn. The lien was filed December 20, 1962, and perfected by judgment on December 27, 1963. Kullberg held an attachment lien in the amount of $35,260; it was filed September 28, 1962, and perfected by judgment on April 23, 1964. The legal questions presented are complex, but they essentially involve the propriety of the foreclosure sale procedure and the priority of petitioners' liens over costs of adminis-

tration and expenses of preserving the estate.

The facts are as follows. On July 22, 1963, the debtors commenced the Chapter XI proceedings. They then owned the real property, personal property and liquor license comprising the Bret Harte Inn. In addition to the aforementioned liens, petitioners Weisenburg and Kullberg held a deed of trust on the real property in the amount of $28,000. The Bank of California held a chattel mortgage on the personal property. Petitioners had scheduled a foreclosure sale on their deed of trust for that very day, July 22, but an order of this court prevented it. The Referee continued to prevent petitioners from foreclosing on their deed of trust, and the debtors continued to operate the Inn for the next four and one-half months. The Referee appointed Raymond S. Torkelson receiver to operate the Inn on December 5, 1963, pursuant to the petition of Weisenburg and Kullberg.[1]

Petitioners continued to press for permission to foreclose which the Referee eventually granted. On October 29, 1964, under the powers contained in the deed of trust, the Inn was sold at public auction. The successful bidder was Samuel Kalman who bid $60,000 for the real property and $30,000 for the personal property. He then negotiated sale of the liquor license from the receiver for $10,000. Kalman deposited $20,000 with the title company but then defaulted on his bid.

On November 29, 1965, the Referee ordered Bulkeley Enterprises, Inc. substituted as buyer pursuant to the petition of the receiver filed on November 17, 1965. But sometime later Bulkeley Enterprises also defaulted on its agreement to purchase the Inn.

On February 24, 1966, the Referee authorized the receiver to accept an of-

---

1. Petitioners assert that they were coerced into petitioning for appointment of the receiver since they were unable to foreclose and the debtors were operating the Inn to the disadvantage of the creditors. Thus, they argue that they should not be held to have acquiesced in the receiver's appointment which might subject their security interests to expenses of preserving the estate. See discussion *infra* at 202.

fer of $105,000 from Arnold Cort (or his nominee) for the property. The terms of the sale were set forth in a deposit receipt which specified a $99,000 purchase price for

> All that real property and improvements commonly known as the Bret Harte Inn (Legal to be furnished in escrow) plus all personal property owned by seller on the premises including supplies and furnishings. An inventory and bill of sale to be supplied in escrow.

The deposit receipt also set forth the receiver's agreement to sell Cort the liquor license for $6,000. The deposit receipt contained the following recital:

> It is here understood that the buyer is applying $79,000 to the purchase of the real property and $20,000 to the purchase of all fixtures, furnishings and supplies.

The Referee found that the transactions involving Bulkeley Enterprises and Cort were not resales of the property on default of Kalman but rather a continuation of the original sale. The Referee indicated in his findings of fact that he was not authorizing separate and distinct sales to the substituted purchasers, but there is nothing to indicate that Kalman had anything to do with the "substitution."

The total Cort bid was $5,000 more than the Kalman and Bulkeley bids. The Referee found that the extra $5,000 was offered as an inducement to the Referee and creditors to approve the bid. The Referee allocated the extra $5,000 pro rata to the real property, personal property and liquor license as follows:

|  | Kalman Sale | Cort "bonus" | Final Sale |
|---|---|---|---|
| Real Property | $ 60,000.00 | $ 3,000.00 | $ 63,000.00 |
| Personal Property | 30,000.00 | 1,500.00 | 31,500.00 |
| Liquor License | 10,000.00 | 500.00 | 10,500.00 |
| Total | $100,000.00 | $ 5,000.00 | $105,000.00 |

Prior to the Cort bid the title company had filed an interpleader action in state court to dispose of the $20,000 Kalman deposit. Petitioners filed cross-complaints in that action seeking specific performance against Kalman. After the Cort sale, however, the Referee authorized the return of $15,000 to Kalman. The remaining $5,000 was paid to the receiver and went into the estate. Petitioners contend that they rather than the estate are entitled to the $5,000 because Kalman released it in consideration of their dropping their cross-complaints for specific performance.

After the Cort sale the escrow holder paid $56,860.93 in miscellaneous fees, taxes, liens, etc. chargeable to the real property. This included full payment of petitioners' deed of trust but not the two liens here in question. The escrow holder also paid $2,640.85 to the State Board of Equalization for transfer of the liquor license. The remainder—$45,498.22—was paid to the receiver. Of this the Referee authorized payment of $20,000 to the Bank of California on its chattel mortgage. There then remained for disbursement $25,498.22.

The Referee's order distributing the $25,498.22 is the order being appealed. The Referee ordered part of the money distributed to cover expenses incurred operating the Inn between the filing of the Chapter XI petition and the Cort sale. The receiver, his accountant and court reporters received fees from this money. The Referee also awarded $1,500 to petitioners for their expenses in protecting their security interests. Thus, the order being appealed applied the proceeds from the sale of secured property to pay costs and expenses of preserving the estate and expenses of

administration without first paying the secured interests. Petitioners protest the propriety of this.

Petitioners contend that rather than valuing the proceeds from the sale of the real property at $63,000 (the original $60,000 Kalman bid plus the $3,000 portion of the Cort "bonus"), the Referee should have valued the proceeds at $79,000, the amount "applied" by Cort in the deposit receipt. Deducting the payments made by the escrow holder of $56,860.93, this would leave $22,139.07 in the real property account which they claim must be applied to their liens before any expenses of administration are paid. They argue that no costs or expenses of preserving the estate should have been allocated because the continued operation of the Inn was to the detriment rather than benefit of the creditors.

Concerning the benefit of continuing the Inn's operation, the Referee found the following facts:

These costs [of administration and of preserving the estate] benefitted the entire estate of the debtors, particularly including the assets against which the creditors L. E. Weisenburg, Jr., and Oliver Kullberg claim liens, inasmuch as said costs preserved the value of the Bret Harte Inn as a going business prior to its sale and also enabled the Bret Harte Inn to be insured against fire and other hazards pending its sale.

The Referee also found the following fact:

The creditors L. E. Weisenburg, Jr., and Oliver Kullberg incurred no more than $1,500.00 as expenses and Attorney's fees in preserving their security interest in the Bret Harte Inn real property.

■ I first consider the foreclosure sale procedure and the correct valuation of the proceeds from the sale of the Bret Harte Inn real property. The Referee treated the Bulkeley Enterprises and Cort bids not as separate sales but as "substitutions." The foreclosure sale was held pursuant to California law— Cal.Code of Civil Procedure § 692 et seq. The section concerning non-payment of bids is § 695:[2]

If a purchaser refuse to pay the amount bid by him for property struck off to him at a sale under execution, the officer may again sell the property at any time to the highest bidder, and if any loss be occasioned thereby, the officer may recover the amount of such loss, with costs, from the bidder so refusing, in any Court of competent jurisdiction. (West 1955)

No authority has been cited to me and I have found none authorizing a deviation from this procedure such as the "substitution" effected in this case. Since the power to make a foreclosure sale is derived from statute,[3] such sale must be effected in the manner provided by statute.[4] It therefore follows that after Kalman's default another separate sale should have been made pursuant to § 695. The Cort sale should have been treated as a separate sale rather than as a continuation of the Kalman sale.[5]

2. While § 695, unlike §§ 692, 693 and 694 which by their terms apply to sales under power contained in mortgages or deeds of trust, refers only to sales "under execution," this appears to be the result of legislative oversight. Law on this point is sparse, but I am satisfied that § 695 applies to sales under mortgages and deeds of trust. See Bell v. Redwine, 98 Cal.App. 784, 277 P. 1050 (1929); 34 Cal.Jur.2d, Mortgages and Trust Deeds § 724 (1957).

3. See Spaulding v. Howard, 121 Cal. 194, 53 P. 563 (1898).

4. Bell v. Redwine, 98 Cal.App. 784, 277 P. 1050 (1929); cf. Cal.Code of Civil Procedure § 726 (West Supp.1969).

5. I do not decide whether, under the circumstances of this case, the failure to follow the mandated statutory procedure invalidates the sale or clouds the buyer's title. The only question properly before me is the correct application of the sale's proceeds assuming that the sale

Treating the Cort sale as separate, what was the proper valuation of his bid? Cort's deposit receipt recited a $99,000 consideration for the real and personal property. This included $79,000 for the real property and $20,000 for the personal. The Referee allocated only $94,500 to the real and personal property ($63,000 and $31,500).

█ A buyer will naturally be anxious to apportion a purchase between real and personal property so as to realize maximum tax benefits for himself. This may create an allocation considerably out of line with the fair market value of the respective properties. The ideal solution is to sell the real and personal property separately, letting the market determine the proceeds for the respective creditors. But this is unrealistic in the case of a going business such as the Bret Harte Inn. The buyer should, as he did here, allocate his total offer between the real and personal property. The remedy for the security holder not satisfied with the allocation is to reject the sale. However, once the security holders accept the allocation of the buyer, as both real and personal property security holders did in this case, the Referee may not step in and make an artificial allocation different from the allocation contained in the bid to which the security holders have consented. This is especially so where, as here, the total amount of the bid is less than the total of the liens owned by the consenting security holders. Thus, the Referee should have allocated $79,000 to the real property and $20,000 to the personal property.

█ I turn next to the proper beneficiary of the $5,000 Kalman defaulted deposit. Kalman had originally deposited $20,000 but then refused to go through with the sale for reasons he considered legally justified. As previously stated the title company brought an interpleader and declaratory judgment action to dispose of the deposit. Petitioners, who held the deed of trust as well as their liens on the real property, filed two cross-complaints seeking specific enforcement of the sale or damages in the event the sale was not completed. The case proceeded to the point where a date was set for a pre-trial conference. The matter was taken off calendar because the receiver failed to enter a pleading on behalf of the debtors. The parties eventually worked out a compromise settlement whereby $15,000 was returned to Kalman. Kalman's attorney, Louis J. Glicksberg, wrote the Referee some six months after the settlement as follows:

> In my opinion the sole consideration to my client for said settlement was the dismissal by L. E. Weisenburg, Jr. and Oliver Kullberg of all their claims as beneficiaries against him arising out of said trustee sale and the return of $15,000 of his deposit and a release from any further distasteful litigation.

The $5,000 was paid by the escrow holder to the receiver along with the other proceeds from the Cort sale. The receiver retained the money for the estate. Petitioners contend that the money is rightfully theirs. Since it was not the estate but the trustee for the petitioners who conducted the foreclosure sale, why should the estate benefit from the default rather than petitioners? There was no surplus from the sale whch could have gone to unsecured creditors, and therefore they were not damaged by the default. Consequently the secured creditors are entitled to the $5,000 ahead of the unsecured creditors. I can think of no reason not to accept Glicksberg's

---

was valid. However, I cannot help but add the following comments. There appears to be no reason to invalidate the sale since the intended beneficiaries of the public auction procedure, the trustors; i. e., the debtors, were fully represented by counsel during all stages of the proceedings leading to the Referee's ac-

ceptance of the Cort bid and consented to it. More importantly, the receiver, representing the estate, consented to the sale. Having consented to the Cort sale without public auction, neither the trustors nor the receiver should now be permitted to contest the sale on that ground.

characterization of the settlement; it was stated in a letter to the court by an officer of the court. There is no evidence to the contrary. The only other secured creditor besides petitioners, the chattel mortgagee, does not claim any interest in the $5,000. But even if it did, petitioners would be entitled to the money on the uncontroverted representations of Glicksberg.

■ Lastly I consider the question of priority of secured liens over expenses of preserving the estate and expenses of administration. Section 64 of the Bankruptcy Act sets out certain debts which have priority. Section 64 is applicable in Chapter XI proceedings.[6] It provides first priority for the "actual and necessary costs and expenses of preserving the estate subsequent to filing the petition" and for "the costs and expenses of administration." However, as the court in Durand v. N.L.R.B., 296 F.Supp. 1049, 1057 (W.D.Ark.1969) points out

> It is a well established principle of bankruptcy law that the "priority claims" recognized by section 64a, including expenses of administration, do *not*, in general, take precedence over liens which are valid against the Trustee * * *.[7] [citing 3A Collier on Bankruptcy, para. 64.02 [2]]

According to Collier, there are two exceptions to that general rule. Some exceptions are to be found in the application of section 67c of the Act which has nothing to do with this case. Others consist of "costs of administration which actually benefit the lien interest"; those costs are to be paid out of the funds available for the lien so benefitted. Collier, op. cit., ¶ 64.105 [1.4].

A more complete discussion of the problem appears in 4A Collier on Bankruptcy, para. 70.99 [6] (1969):

> Where the bankrupt's property is sold free of liens and encumbrances, one of the chief problems is the allocation of expenses, both of the sale itself and of the administration of the property, between the lienholders and the estate. (4A Collier at 1223–24) [footnotes omitted]

> \*    \*    \*    \*    \*    \*

> A great number of courts have adopted the preferable view that where the lienholder expressly or impliedly consents to a sale free of liens and encumbrances, at least where the sale fails to bring in enough to discharge the lien and interest thereon in full, the proceeds are chargeable with the actual costs of the sale, plus costs reasonably incurred in the preservation of the property and the proportion of the administrative expenses * * * that may properly be attributed to the sale. It has been said that the circumstances of whether or not there is sufficient money in the general estate to defray such expenses "is immaterial." Nevertheless, the lienholder cannot be charged with additional expenses or the general costs of administration of the bankrupt's estate—such as costs of operating the business or the expenses and losses thereof, the general fees of the receiver, referee or trustee, and the like—unless he has in some manner caused or benefitted from such expenditure, or expressly or impliedly consented thereto. 4A Collier at 1227–34) [footnotes omitted]

It cannot be seriously contended that in the instant case the petitioners came voluntarily into the bankruptcy court to enforce their liens. They were specifi-

---

6. *See* 11 U.S.C.A. § 702 (1946).

7. *See also* United States v. Speers, 382 U.S. 266, 269 n. 3, 86 S.Ct. 411, 15 L.Ed.2d 314 (1965); In re Quaker City Uniform Co., 238 F.2d 155, 157 (3d Cir. 1956). On this petition for review the receiver attacked the validity of petitioner Weisenburg's lien. This was the first time in these proceedings the receiver raised the issue. The Referee treated the Weisenburg lien as valid, and I do also. *See* In re Cox, 244 F.Supp. 430 (W.D.Mo.1965).

cally enjoined by the court when they tried to foreclose their liens. Once the Referee had assumed jurisdiction over the property their later appearances and conduct in the bankruptcy court in protecting their interests cannot be construed as express or implied consent to actions of the bankruptcy court.

■ Whether the Referee's finding that the lienors benefitted from the continued operation of the business at a loss was clearly erroneous is a close question, but any incidental benefit to the lienors is irrelevant in the Ninth Circuit. Apparently the only Ninth Circuit case to consider this problem was In re Williams' Estate, 156 F. 934 (9th Cir. 1907). The court there held as follows:

By coming into the bankruptcy court, therefore, the holder of a valid lien upon the estate of a bankrupt comes into an appropriate place and into a court amply able to enforce and protect his rights. By doing so the lienholder waives none of his rights. The enforcement of his lien in another court would entail upon the proceeds of the property upon which the lien exists the payment of the appropriate court costs; and so, *in the enforcement of such lien in a court of bankruptcy, the proceeds of the property of the bankrupt upon which such lien exists is properly chargeable with the costs of such court appropriate to such enforcement but with no other or further costs. They are not chargeable with the general costs of the administration of the bankrupt's estate, such as the services of a receiver in carrying on the business of the bankrupt, the expenses and losses of such business, the fees of the attorney for such re-ceiver, the general fees of the trustee or those of his attorney.* If so, the valid lien upon the estate of the bankrupt, which the bankruptcy act expressly declares shall be unaffected by any of its provisions, might very readily be destroyed, as it would unquestionably be, should such costs equal or exceed the proceeds in cases like the present, where the aggregate amount of the valid liens exceeds the proceeds of the entire estate of the bankrupt. (156 F. at 939) [emphasis added]

Thus, in the Ninth Circuit non-consenting lienholders [8] can be charged only with expenses directly connected with the sale —those expenses inherent in the selling procedure which were incurred by the bankruptcy court only because it had jurisdiction over the property and which would have been incurred by someone else had the sale taken place independent of the bankruptcy court. Virtually every expense item in the order on review arose because of the continued operation of the business. These cannot properly be charged to petitioners who in their double identity of beneficiaries under the deed of trust and judgment lienholders had continuously opposed the Referee's assumption of control over the property. The Referee's action in preventing the foreclosure and continuing the business was obviously taken for the benefit of the unsecured creditors, and they must bear the expense of that decision.

It is therefore ordered that the order of the Referee be, and the same is, hereby vacated, and the case is remanded for further proceedings consistent with this Memorandum and Order.

---

8. In the Second and Fifth Circuits, this restrictive rule applies to lienholders *consenting* to sale by the bankruptcy court as well. Other courts have interpreted *Williams' Estate* to apply to con-senting as well as non-consenting lienholders, but along with Collier I do not think the case goes that far. *See* 4A Collier, *supra* at 1234–36 n. 45.