**In re ORCHID ISLAND HOTELS, INC., Bankrupt.**

**Bankruptcy No. 76–0061.**

United States Bankruptcy Court, D. Hawaii.

March 26, 1982.

Allan S. Chock, Honolulu, Hawaii, for Dept. of Taxation.

Takeo Tokumaru, George M. Takane, Honolulu, Hawaii, co-trustees.

James Duca, Honolulu, Hawaii, for Krist Ann Advertising.

Connie Meredith, Honolulu, Hawaii, for debtor.

Lawrence I. Weisman, Towson, Md., Jerry A. Ruthruff, Honolulu, Hawaii, for Wong.

Jeffrey Choi, Hilo, Hawaii, for Hilo Const.

H. William Burgess, Honolulu, Hawaii, for ERS.

Carol K. Yamamoto, Dept. of Labor and Indus. Relations, Honolulu, Hawaii, for "DLIR".

Stephen K. Yamashiro, Hilo, Hawaii, for Frost & Omta.

## MEMORANDUM OF DECISION: PRIORITY STATUS OF VARIOUS CLAIMS

JON J. CHINEN, Bankruptcy Judge.

The issue in this case is whether or not the respective claims of various creditors are entitled to priority ahead of the Employees' Retirement System, a secured creditor.

A hearing on this matter was held on October 17, 1980, pursuant to the filing by the Co-Trustees of an Application for Final Determination as to Priority of Various Claims. At the hearing Lawrence I. Weisman appeared on behalf of himself, as original counsel for Willard M. P. Wong (hereafter "Wong"), the state court-appointed Receiver of the Orchid Island Hotel; H. William Burgess appeared on behalf of the State Employees' Retirement System (hereafter "ERS"); Stephen K. Yamashiro for Frost and Omta; Connie G. W. Meredith for Orchid Island Hotels, Inc. and Pecos Land and Cattle Corporation; George M. Takane on behalf of himself as Co-Trustee of the bankrupt estate; James N. Duca on behalf of Krist Ann Advertising, Inc.; Carol K. Yamamoto for the State Department of Labor and Industrial Relations (hereafter "DLIR"); Allan S. Chock for the State Department of Taxation; Jerry A. Ruthruff on behalf of Receiver Wong (re-

placed Weisman as counsel on April 10, 1978); and Jeffrey Choi on behalf of Hilo Construction, Inc. The Court took the matter under advisement and requested any further memoranda on the issue.

Based, upon the record and memoranda filed herein, and the arguments of counsel, the Court finds that the pre-petition debts incurred do not have priority over the status of ERS. The Court also finds that the post-petition expenses should not be paid from the proceeds of the ERS sale as costs and expenses of the sale of the hotel.

## I. *Factual Background*

On February 5, 1975, ERS, the first mortgagee, commenced a foreclosure action in the First Circuit Court, State of Hawaii. Subsequently, ERS requested that the state court appoint a receiver to take possession of and operate the Orchid Island Hotel during the pendency of the foreclosure proceedings. ERS had alleged that cessation of hotel operations would not be in the best interests of the parties to the foreclosure proceeding since the hotel would be more readily saleable and could command a higher price as an ongoing concern. On October 6, 1975, the Circuit Court appointed Mr. Willard Wong as receiver, with instructions to continue operation of the hotel. Pursuant to the Order Appointing Receiver, Wong took control over the hotel and continued its operation until shortly after the commencement of the bankruptcy action.

Orchid Island Hotels, Inc., hereafter "Bankrupt", filed a petition for corporate reorganization under Chapter X on February 9, 1976. On March 15, 1976, the Bankruptcy Court authorized the Receiver to borrow additional monies from ERS, not to exceed $15,000.00. Following an evidentiary hearing on March 26, 1976, on the petition for reorganization, Judge Martin Pence declared Orchid Island bankrupt (the Order for Adjudication was entered June 29, 1976).

On April 30, 1976, the Court ordered retention of jurisdiction over the property and authorized sale of the property. The duly appointed state commissioners, George Takane and Takeo Tokumaru, were also appointed commissioners in this court to sell the real property.

On June 23, 1976, this Court entered an Order for Negotiated Sale of Real Estate, authorizing the purchaser, Salisbury Estate, to take possession of the property and to operate the hotel pending completion of the $2.75 million sale. On October 14, 1976, Salisbury Estate was found in default and the hotel was then sold to Frost and Omta, second mortgagees, for $1.5 million.

By order of the Court, Frost and Omta were given an extension until June 30, 1977, to pay the purchase price and complete the sale. As of August 10, 1977, however, Frost and Omta were found to be in substantial default and the Co-Trustees (earlier appointed commissioners) were ordered to sell the hotel at public auction.

At the public auction held on September 19, 1977, ERS purchased the Orchid Island Hotel. On November 10, 1977, the Court confirmed the sale to the ERS, the first mortgagee for a purchase price of $1,200,-000.00. The Order provided:

And it is further ORDERED, ADJUDGED AND DECREED that the Employees' Retirement System, State of Hawaii, shall deposit with the Commissioners such amount as may be ordered by the Court for the payment of administrative expenses and costs incurred herein; and the deposit of the remainder of the purchase price shall be subject to further order of this Court.

On December 26, 1979, in its Order Approving Compromise (of Real Property Taxes) this Court held that real property taxes are a paramount lien and the ERS was ordered to pay $115,781.26 out of the purchase price for the hotel so that the bankruptcy trustees could pay that sum to the State Tax Office in settlement of the real property tax claims. This Court has not ordered any further payments out of the proceeds of the sale.

There exist numerous claims to the proceeds from the sale to the ERS. Briefly the creditors' claims can be summarized as follows:

### A. *Hilo Construction, Inc.*

This claimant seeks payment of compensation for repair work done to Orchid Island Hotel as a result of earthquake damage. At the time the repair work was done the hotel was being operated under the receivership of Wong. A proof of claim was filed on May 17, 1976 in the amount of $4,672.00.

### B. *Krist Ann Advertising, Inc.*

The claimant alleges that it provided entertainment and advertising services for Orchid Island Hotel from October 8, 1975 through February 5, 1976 (during the state receivership period) totaling approximately $21,068.14. A proof of claim was filed on June 9, 1976 in the amount of $2,378.10 for the unpaid balance.

### C. *Department of Labor & Industrial Relations*

DLIR has filed claims for unpaid wages and unemployment compensation taxes due and unpaid both before and after the filing of the bankruptcy petition. In the alternative, DLIR claims these debts as costs of the sale of the property.

### D. *Department of Taxation*

The Director of Taxation claims priority for all general excise and withholding taxes incurred and due from October 6, 1975 to present. The claims presented relate to or arose in connection with the foreclosure proceedings in the state and federal courts.

### E. *Receiver Wong and Attorney for Receiver*

Receiver Wong, represented by attorney Weisman, seeks compensation for services rendered and monies advanced for the operation and maintenance of the Orchid Island Hotel.

Mr. Weisman, the attorney for Wong, seeks compensation for services rendered during the administration of Orchid Island Hotel in the State Court prior to the bankruptcy proceeding, as well as during the present bankruptcy proceedings.

### F. *Attorney for Bankrupt*

The attorney for the Bankrupt is seeking reasonable attorneys' fees of $7,220.00 as an administrative claim for services rendered after the petition in bankruptcy was filed.

### II. *Discussion*

In determining whether each particular claim has priority over ERS, a distinction must be made between pre-petition and post-petition claims. The following priority analysis will be divided first, into a discussion of the pre-petition claims, and next, the post-petition claims against ERS. These claims will be treated separately because different issues arise in determining the priority of distribution of the proceeds from the sale of the hotel.

### A. *Pre-petition Expenses*

Included among the various creditors asserting claims ahead of ERS for debts which were incurred during the state receivership period are: the Receiver and his attorney, Mr. Weisman; Hilo Construction, Inc.; Krist Ann Advertising; DLIR and the State Department of Taxation. Each of these claimants seeks reimbursement against the bankrupt estate out of proceeds from the sale of ERS for compensation and/or expenses of the superseded receivership.

The principles governing the propriety and amount of allowances for pre-bankruptcy expenses are generally derived from the landmark case of *Randolph v. Scruggs*, 190 U.S. 533, 23 S.Ct. 710, 47 L.Ed. 1165 (1903). The doctrine of *Randolph v. Scruggs* has been referred to as the "benefit" doctrine and may be summarized as follows:

> Any real services either of an assignee under a deed of assignment or of a receiver acting under judicial authority will be allowed as a preferred claim in the administration of the property and the distribution of its proceeds to the extent that the services have benefited the estate. *Hume v. Myers*, 242 F. 827, 830 (4th Cir. 1917).

**932**

*See also, Chase Bag Co. v. Schouman,* 129 F.2d 247 (6th Cir. 1942); *Paine v. Archer,* 233 F. 259 (9th Cir. 1916); and *In re Garrett Road Corp.,* 256 F.Supp. 709, 713 (E.D.Pa. 1966).

In *Randolph* the Supreme Court stated the principle that costs of a superseded assignment for the benefit of creditors [1], including attorney's fees for representation of the assignee, were entitled to first payment out of the bankrupt estate as an equitable lien. This equitable lien would be imposed provided that the costs were beneficial and tended to preserve the assets. The Court reasoned that reimbursement and/or allowances were due not as costs of administration or provable claims, but based on the theory that the assignee was entitled to deduct the expenses before being required to surrender the balance of the assets to the bankruptcy court.[2] Thus, if the receiver turned over all the assets, the deductible expenses should be reimbursed to him.

▇▇▇ Applying the principles of the *Randolph* case, from the record it is clear that Krist Ann Advertising, Hilo Construction, and the hotel employees provided services which were beneficial and tended to preserve the estate. The problem is that the Receiver failed to pay these claimants and *Randolph* is applicable when the receiver has already paid the necessary costs and expenses and is now seeking reimbursement under an equitable lien theory. An individual creditor may be reimbursed for services during the superseded proceeding only when there is a resulting benefit to the estate as an entirety, and the creditor has not acted solely for his own benefit. Such a creditor may be preferred only to the extent that the receiver would be allowed a lien if he had paid for their services or goods. *Randolph v. Scruggs, supra.*

▇▇▇ It is true that ERS as the first mortgagee requested the appointment of a receiver in its foreclosure action. This re-quest and appointment did not, however, create an agency relationship between ERS and the Receiver. The Receiver never had the authority to obligate ERS to pay his unauthorized obligations.

In *Unna v. Brown,* 7 Hawaii 190 (1887), the Hawaii Supreme Court cited *Fosdick v. Schall,* 99 U.S. 235, 25 L.Ed. 339 (1878), and stated that mortgagees who joined in an application for the appointment of a receiver, "as a measure needed to save their interests", would be required to contribute to any losses made in the effort to save the value of the collateral. The Hawaii Supreme Court also clearly noted that the authority of a receiver is limited to the terms set forth by the court.

Likewise in *Miller v. Leadership Housing Systems, Inc.,* 57 Hawaii 321, 555 P.2d 864 (1976), the Hawaii Supreme Court stated:

> Under general equitable principles, the costs and expenses of a receivership incurred in preserving its assets are administrative expenses, chargeable to the assets of the receivership. Such costs and expenses may be properly incurred by the receiver for repairs and even for improvements to property if they are necessary to preserve the property in the hands of the receiver. (Citations omitted). *Id.* 327–28, 555 P.2d 864.

In the instant case, ERS did not seek to have a receiver appointed in order to save or restore the value of the collateral. Rather, ERS believed that the hotel would be more readily saleable and could command a higher price as an ongoing concern. In effect, maintaining the hotel as a going concern was for the benefit of all the creditors. At the time the Receiver was appointed (October 6, 1975), the amount owing to ERS, the first mortgagee, was approximately $1,100,000.00, *see* Interlocutory Decree of Foreclosure entered by the Circuit Court on January 22, 1976. Thus, any pur-

---

1. Later cases make no distinction between assignment and receivership for these purposes. *See, e.g., Chase Bag Co. v. Schouman,* 129 F.2d 247, 248 (6th Cir. 1942); *In re Garrett Road Corp.,* 256 F.Supp. 709, 712–13 (E.D.Pa.1966).

2. For further discussion *see* Treister, *The Effect of Bankruptcy on the Administration Expenses of a Superseded General Assignment,* 17 Bus. Law. 332 (1962).

chase price greater than this amount would inure to the benefit of all the other interested parties.

As earlier stated Hilo Construction, Krist Ann Advertising and the hotel employees provided services which were beneficial and tended to preserve the estate. Hilo Construction repaired the damage to the hotel that was caused by an earthquake. If repair had not been promptly made, the elements would have damaged the hotel to the detriment of ERS.

The advertisements handled by Krist Ann Advertising attracted customers to the hotel and night club. Having customers at the hotel, enabled the Receiver to hire employees for the hotel. The presence of hotel employees discouraged acts of vandalism. Vandalism against the hotel and its facilities would have caused the value of the hotel to decrease to the detriment of ERS.

Since the construction company, the advertising agency and the employees of the hotel did render services which benefited the hotel, under normal circumstances, this Court would have required ERS to pay the amount of their claims. In this case, however, ERS had already advanced approximately $70,000.00 to the Receiver, pursuant to prior court authorization, for the purpose of paying operating expenses of the hotel. It is not clear as to how the Receiver used said $70,000.00, in addition to the income generated by the hotel.

▪ ERS shall not be able to recover the monies it had advanced to the Receiver. That amount is its payment for the costs in the preservation of the estate by the Receiver, including, *inter alia*, the cost of repairing the damage caused by the earthquake, the cost of the advertisement and the wages of the employees. It would be inequitable to now require ERS to pay an additional amount out of the proceeds of the sale of the hotel to cover the claims of the construction company, the advertising agent and the employees of the hotel. ERS had already advanced the money to the Receiver to cover these operating costs. The fact that the Receiver used the $70,-000.00 for other purposes should not be

cause to penalize the ERS. There are assets in the estate of the Bankrupt. The construction company, the advertising agent and the employees may assert their claims against the assets of the estate, but they do not have an equitable lien superior to that of ERS. Similarly, DLIR and the Department of Taxation may be paid on their respective pre-petition claims out of the general assets of the estate, but not against the sale proceeds of ERS.

▪ As for the Receiver and his attorney, the Court finds that their services did not specially benefit the estate. In fact, the conduct of the Receiver in not carefully supervising and monitoring the use of the money in his control has caused much of the litigation in this case. Often in a receivership the receiver loses money. This fact should be promptly reported to the court. In this case the Receiver sustained large losses and appears not to have timely reported this fact to the state court or the creditors. Furthermore, he exceeded his authority in operating the hotel and did not exercise prudence in handling the receivership property. From the facts before the Court, it appears that the services of the Receiver's counsel in the pre-bankruptcy proceedings did not benefit the estate.

### B. *Post-Petition Expenses*

Among the creditors filing claims for debts which arose subsequent to the filing of the petition are the attorneys for the state Receiver and the Bankrupt, both seeking fees for services rendered; the State Department of Taxation for taxes related to foreclosure proceedings in the bankruptcy court; and the Department of Labor & Industrial Relations for unpaid wages and unemployment taxes due after the filing of the petition.

Pursuant to Section 64(a) of the Bankruptcy Act, 11 U.S.C. Section 104(a), certain debts including the costs and expenses of administration of the estate, wage claims, and taxes owing by the bankrupt to any state, are considered debts having priority in the distribution of the bankrupt's estate.

The relevant language of this section provides:

> Section 64. Debts Which Have Priority. a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition. . . . (2) wages and commissions, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding. . . . (4) taxes which became legally due and owing by the bankrupt to the United States or to any state or any subdivision thereof which are not released by a discharge in bankruptcy . . . .

▆▆▆ Assuming that the above-mentioned claims would qualify as priority debts which are given the statutory advantage in distribution, these claims are only superior in position to other unsecured creditors, not secured creditors. In comparison, a secured creditor has "a property right which entitles him to be paid out of the assets against which the security attaches", H.R.Rep.No.687, 89th Cong. 1st Sess. (1966). While section 64(a) adjusts priorities among unsecured creditors, Section 67 recognizes the validity of liens perfected before bankruptcy as against unsecured claims. Thus, the general rule is that a valid lien[3] must be satisfied in full before any payment of dividends to unsecured creditors or administrative expenses can be made. *U. S. v. Speers*, 382 U.S. 266, 269 n.3, 86 S.Ct. 411, 413 n.3, 15 L.Ed.2d 314 (1965); *Goggin v. California Labor Division*, 336 U.S. 118, 127, 69 S.Ct. 469, 474, 93 L.Ed. 543 (1949); *In re Mount Holly Paper Co.*, 110 F.2d 220, 224 (3d Cir. 1940); *Durand v. N. L. R. B.*, 296

F.Supp. 1049, 1057 (W.D.Ark.1969); *In re Goldstein*, 34 F.Supp. 876, 879 (E.D.Pa. 1940). Furthermore, secured claims generally are not chargeable with the general costs of administration of the bankrupt's estate; *Oppenheimer v. Oldham*, 178 F.2d 386, 389 (5th Cir. 1949); *In re Hull*, 311 F.Supp. 197 (E.D.Cal.1965).

▆▆▆ In this case the sale proceeds of $1,200,000.00 are insufficient to satisfy the ERS lien of approximately $1,800,000.00 in full. Therefore, no part of the proceeds would be available for the priority claimants. Exceptions do exist, however, to the general rule that lienholders must be paid in full before unsecured creditors can be paid. One well-established exception is that where the costs of administration actually benefit the lien interest, these costs will be paid before the secured creditors' claims are satisfied. 3A *Collier on Bankruptcy* ¶ 64.105[1.4] and 4B *Collier on Bankruptcy* ¶ 70.99[6] (for a more complete discussion). This exception includes the sale of property in which proceeds are chargeable with costs reasonably incurred in the preservation of the property. 4B *Collier on Bankruptcy* ¶ 70.99 (n.35 et seq. 19  ); *Byrer v. Bushong*, 108 F.2d 594, 596 (4th Cir. 1940); *In re Prindible*, 115 F.2d 21 (3d Cir. 1940); *Tawney v. Clemson*, 81 F.2d 300, 304 (4th Cir. 1936); *In re Orbitronics, Inc.*, 254 F.Supp. 400 (E.D.Wis.1966).

▆▆▆ By its failure to object[4] and its direct participation in the sale of the hotel, as the highest bidder, ERS appears to have voluntarily agreed[5] to the sale and must now be willing to defray the direct, necessary and beneficial costs of administration in preserving and realizing its security. *In re Myers*, 24 F.2d 349, 351 (2d Cir. 1928). The Ninth Circuit considered this problem in the case of *In re Williams' Estate*, 156 F. 934 (9th Cir. 1907), in which it held:

---

3. There is no issue here as to the validity of the ERS lien. No party has objected to ERS as the first mortgagee on the property.

4. On April 12, 1976, ERS did petition to remove the stay so that the foreclosure sale in state court could proceed. Judge Pence denied the petition and ordered the sale in the Bankruptcy Court.

5. Even if ERS did not actually consent to the sale, more recent cases have ignored consent completely, thus avoiding confusing precedents. Although a vital factor in some circuits, it has had little practical importance in determining the lienholder's liability.

It is true that the record in this case shows that the lienholder voluntarily came into the bankruptcy court and asked that the property covered by its liens be sold by that court . . .

\*     \*     \*     \*     \*     \*

By coming into the bankruptcy court, therefore, the holder of a valid lien upon the estate of a bankrupt comes into an appropriate place and into a court amply able to enforce and protect his rights. By doing so the lienholder waives none of his rights. The enforcement of his lien in another court would entail upon the proceeds of the property upon which the lien exists the payment of the appropriate court costs; and so, in the enforcement of such lien in a court of bankruptcy, the proceeds of the property of the bankrupt upon which such lien exists is properly chargeable with the costs of such court appropriate to such enforcement but with no other or further costs. They are not chargeable with the general costs of the administration of the bankrupt's estate, such as the services of a receiver in carrying on the business of the bankrupt, the expenses and losses of such business, the fees of the attorney for such business, the fees of the attorney for such receiver, the general fees of the trustee or those of his attorney. If so, the valid lien upon the estate of the bankrupt, which the bankruptcy act expressly declares shall be unaffected by any of its provisions, might very readily be destroyed, as it would unquestionably be, should such costs equal or exceed the proceeds in cases like the present, where the aggregate amount of the valid liens exceeds the proceeds of the entire estate of the bankrupt. *Id.* at 939.

It must now be determined what portion, if any, of the proceeds are chargeable with the actual costs of the sale, plus any preservation costs.

In allocating the costs and expenses incident and related to the sale, the Court acts as a court of equity and will follow equitable principles in its determination. *S.E.C. v. U.S. Realty & Improvement Co.,*

310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940); *In re Evergreen Memorial Park Association,* 308 F.2d 65 (3d Cir. 1962).

Applying the foregoing rules, the attorneys' of both the state receiver and the Bankrupt would be paid out of the proceeds of sale only insofar as they are directly attributable to the sale, *Byrer v. Bushong,* 108 F.2d 594 (4th Cir. 1940). Although the attorneys' services may be entitled to be paid as priority administrative expenses payable out of the general assets of the estate, the services performed in this case were not directly related to preservation of the estate or necessary in selling the property but rather are general costs of administration. Based upon the fee applications submitted to the Court, the services provided by the Bankrupt's attorneys included primarily preparation and filing of the Chapter X petition and schedules, meetings with various creditors and costs of court proceedings prior to the sale. The receiver's attorney spent his time defending receiver Wong in the Frost and Omta litigation which involved the issue of whether or not Mr. Wong acted improperly during his receivership. There can be no allowance for the attorney's fees unless they are connected to the direct preservation of the property and costs of the sale. *Gugel v. New Orleans National Bank,* 239 F. 676, 679 (5th Cir. 1917), *In re Williams' Estate,* 156 F. 934, 939 (9th Cir. 1907). Therefore, since these claims are unrelated to the sale of the hotel, the secured creditor's proceeds cannot be charged with these costs.

With respect to the claims of the tax and labor departments, it is not clear from the record whether these claims will be treated as priority debts under Section 64(a). If these claims were valid liens in compliance with Hawaii Revised Statutes Section 231–33(b) and Sections 67(b) and (c) of the Bankruptcy Act, then as between secured parties, ERS would be in a superior position since its interest would have been perfected prior to the recording by the

**936**

State of its post-petition claims.[6] As priority debts, under Section 64(a)(2) and (4), the general tax claims, wage claims and unemployment tax claims can only be paid ahead of ERS if they preserved the collateral for ERS or were part of the actual costs of sale, otherwise they would be considered costs of general administration of the estate payable out of general assets.

■ During the state court proceedings, ERS made statements to the effect that the continued operation of the hotel would make it more saleable. On June 23, 1976, shortly after the bankruptcy proceeding was commenced, Salisbury Estate was authorized to purchase the hotel and took possession and operated the hotel pending completion of sale. Both the Salisbury Estate and Frost and Omta sales were never completed, although both purchasers took possession and operated the hotel. It was possible to continue the operation of the hotel only by continuing to employ the hotel workers. It is also clear that employment of these workers was possible only if their wages and unemployment compensation contributions were currently paid. Since the continued operation after June 23, 1976, was in effect for the benefit and preservation of the purchasers' interest, ERS should not be charged with the direct and necessary costs incurred for labor during this period of time. As for the period between February 9, 1976 and June 23, 1976, before the hotel was sold to Salisbury Estate, ERS had advanced approximately $15,000 to the receiver to protect and operate the hotel. Therefore, ERS had contributed to the preservation of the hotel.

During the pending sales, the hotel remained property of the estate ultimately under the control of the bankruptcy trustees. Therefore, the Court finds that the post-petition claims for unemployment insurance taxes should be paid out of the estate and not out of the proceeds from the sale to ERS.

■ As for the tax claims relating to the proceedings in the bankruptcy court, this Court finds that ERS is not liable for the general excise and withholding taxes. The property was still the property of the estate during the pending sales to Salisbury Estate and Frost and Omta, and as such the bankrupt's estate was liable for the state taxes. Unless the State can prove that these taxes are somehow related to the expenses inherent in the sale procedure, these claims are general costs of administration and ERS should not be held liable.

III. *Conclusion*

Based upon the preceding discussion, the Court concludes that the respective claims of the pre-bankruptcy and post-petition creditors are not entitled to priority status ahead of ERS as to the proceeds of the sale. With regard to the priority among the creditors to be paid out of the estate, this matter will be determined at a later date.

---

**6.** Priority of liens is determined by state law, *In re Pioneer Sample Book Co., Inc.*, 374 F.2d 953 (3d Cir. 1967). The relevant Hawaii law is Hawaii Rev.Stat. Section 231–33(c).